**P O R T E R  |  S C O T T**

A PROFESSIONAL CORPORATION
Carl L. Fessenden, SBN 161494
Barakah M. Amaral, SBN 298726
350 University Ave., Suite 200
Sacramento, California 95825
TEL: 916.929.1481
FAX: 916.927.3706

Attorneys for Defendants
COUNTY OF SACRAMENTO, SCOTT JONES, and NICHOLAS RUSSELL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

KENARD THOMAS,

              Plaintiff,

v.

COUNTY OF SACRAMENTO; SCOTT
JONES; and NICHOLAS RUSSELL,

              Defendants.

_____/

CASE NO. 2:18-CV-02048 JAM-DB

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, OR IN THE ALTERNATIVE,
PARTIAL SUMMARY JUDGMENT**

**DATE:**   **April 21, 2020**
**TIME:**   **1:30 p.m.**
**CTRM:**  **6, 14th Floor**
**JUDGE:** **Hon. John A. Mendez**

Complaint Filed:  07/26/2018

{02038784.DOCX}

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ............................................................................................... 1

II.     PROCEDURAL BACKGROUND .................................................................... 3

III.    FACTUAL BACKGROUND .............................................................................. 3

        A.    Erika Drayton Reported Seeing Plaintiff With a Firearm ...................... 3

        B.    Plaintiff Has a Violent History ............................................................... 3

        C.    Ms. Drayton Had an Unserved Restraining Order .................................. 4

        D.    Deputies Decided to Attempt to Serve Ms. Drayton's Restraining Order
              on Plaintiff Due to His Violent History ................................................. 4

        E.    Deputies Devised a Plan to Contact Plaintiff Inside the Vacant Home ........... 4

        F.    Plaintiff Intentionally Ran and Hid From the Deputies .......................... 5

        G.    Deputies Conduct First Search of Vacant Home ................................... 5

        H.    Plaintiff Came Out of the Closet Without Any Announcement and Within a
              Couple of Feet of Deputy Russell .......................................................... 6

        I.    Deputy Russell Shot Plaintiff in Fear for His Life ............................... 7

IV.     LEGAL AUTHORITY ........................................................................................ 7

V.      PLAINTIFF'S FIRST CLAIM FOR RELIEF FOR EXCESSIVE FORCE AGAINST
        DEFENDANT RUSSELL FAILS AS A MATTER OF LAW BECAUSE HIS ACTIONS
        WERE OBJECTIVELY REASONABLE UNDER THE TOTALITY OF THE
        CIRCUMSTANCES .............................................................................................. 8

VI.     DEPUTY RUSSELL IS ENTITLED TO QUALIFIED IMMUNITY ................ 11

VII.    PLAINTIFF CANNOT SUSTAIN A BANE ACT CLAIM ............................... 13

VIII.   THE BATTERY CLAIM FAILS ....................................................................... 15

IX.     THE NEGLIGENCE CLAIM FAILS ................................................................ 15

X.      CONCLUSION .................................................................................................. 17

# <u>TABLE OF AUTHORITIES</u>

Page

**Supreme Court Cases**

*Anderson v. Creighton*
     483 U.S. 635, 640 (1987) ................................................................................................. 12

*Anderson v. Liberty Lobby, Inc.*
     477 U.S. 242, 251 (1986) ................................................................................................... 8

*Celotex v. Catrett*
     4776 U.S. 317, 323 (1986) ............................................................................................ 7, 8

*City and County of San Francisco v. Sheehan*
     135 S. Ct. 1765, 1775-1776 (2015) ........................................................................... 12, 13

*City of Escondido v. Emmons*
     139 S. Ct. 500, 503 (2019) ............................................................................................... 12

*City of Los Angeles v. Mendez*
     1137 S. Ct. 1539, 1546-1547 (2017) ............................................................................... 9

*District of Columbia v. Wasby*
     135 S. Ct. 577, 593 (2018) ............................................................................................... 12

*Graham v. Connor*
     490 U.S. 386, 397 (1989) .................................................................................. 8, 9, 12, 15

*Hunter v. Bryant*
     502 U.S. 224, 228 (1991) ................................................................................................. 11

*Kisela v. Hughes*
     138 S. Ct. 1148, 1152 (2018) .................................................................................... 11, 12

*Matsushita Electric Industrial Co., LTD v. Zenith Radio Corp.*
     475 U.S. 574, 586 (1986) ................................................................................................... 8

*Mullenix v. Luna*
     136 S. Ct. 305, 308 (2015) ............................................................................................... 12

*Pearson v. Callahan*
     555 U.S. 223, 2236-237 (2009) ...................................................................................... 11

ii

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

*Plumhoff v. Rickard*
    134 S. Ct. 2012, 2023 (2014) ........................................................................ 12

*Scott v. Harris*
    550 U.S. 372 (2007) ...................................................................................... 8

*Tennessee v. Garner*
    471 U.S. 1 (1985) ................................................................................ 8, 9, 12

*White v. Pauly*
    17 S. Ct. 548, 551 (2017) .................................................................... 11, 12

**Federal Court Cases**

*Acosta v. Hill*
    504 F.3d 1323 (9th Cir. 2007) ................................................................. 8

*Atkinson v. County of Tulare*
    790 F.Supp.2d 1188, 1211 (E.D. Cal. 201) ............................................ 16

*Boarman v. County of Sacramento*
    55 F.Supp.3d 1271 (E.D. Cal. 2014) ...................................................... 14

*C.V. by and through Villegas v. City of Anaheim*
    823 F.3de 1252, 1255 (9th Cir. 2016) ................................................. 11

*Reese v. County of Sacramento*
    888 F.3d 1030, 1043 (9th Cir. 2018) ................................................... 14

*S.B. v. County of San Diego*
    864 F.3d 1010, 1013 (9th Cir. 2017) ................................................ 9, 12

*Shafer v. County of Santa Barbara*
    868 F.3d 1110, 1118 (9th Cir. 2017) .............................................. 11, 12

*Torres v. City of Los Angeles*
    548 F.3d 1197, 1210 (9th Cir. 2008) ................................................... 11

*T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Association*
    809 F.2d 626, 630 (1987) .......................................................................... 7

*Wallisa v. City of Hesparia*
    369 F.Supp.3d 990 (C.D. Cal. 2019) ...................................................... 14

{02038784.DOCX}      iii

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

*Wilkinson v. Torres*
　　610 F.3d 546, 551 (9th Cir. 2010) ............................................................... 8

**State Court Cases**

*Brown v. Ransweiller*
　　171 Cal.App.4th 516, 527 (2009) ............................................................... 15

*Cornell v. City and County of San Francisco*
　　17 Cal.App.5th 766 (2017) ........................................................................ 14

*Edson v. City of Anaheim*
　　63 Cal.App.4th 1269, 1272-1273 (1998) .................................................... 16

*Hayes v. City of San Diego*
　　57 Cal.4th 622, 638 (2013) ........................................................................ 15

*Hernandez v. City of Pomona*
　　46 Cal.4th 501, 513-517 (2009) ................................................................. 16

*Ladd v. County of San Mateo*
　　12 Cal.4th 913, 917 (1996) ........................................................................ 15

*Munoz v. City of Union City*
　　120 Cal.App.4th 1077, 1102 (2004) ........................................................... 15

**Statutes**

42 U.S.C. § 1983 ..........................................................................................3, 8

Federal Rules of Civil Procedure, Rule 56 ......................................................7

Federal Rules of Civil Procedure, Rule 56(c) ...............................................7, 8

California Civil Code § 52.1(a) ......................................................................13

California Civil Code § 52.1(b) ......................................................................14

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

# I.

## **INTRODUCTION**

This case arises out of an officer-involved shooting which occurred on June 13, 2017 at approximately 8 p.m. inside a vacant home in Sacramento, California. Defendant, Deputy Russell and Deputy Rowe responded to a nearby location after dispatch received a call for service from Erika Drayton. Ms. Drayton informed Deputy Russell that she had a domestic violence restraining order against ex-boyfriend, Plaintiff Kenard Thomas (hereinafter "Plaintiff"). Ms. Drayton reported Plaintiff walked by the house where she was living that evening.  She believed Plaintiff may have a firearm in his waistband.  She also reported that Plaintiff was known to go inside a vacant home nearby at 5208 53rd Ave, Sacramento, California (hereinafter "vacant home").

Ms. Drayton and her mother, Carrie Rabourn, proceeded to tell Deputy Russell that they were in fear for their safety, as Plaintiff had physically assaulted Ms. Drayton twice within the last four months. Plaintiff was arrested for both of those domestic violence incidents. During one of the incidents, Drayton reported that Plaintiff broke her nose. Further, Ms. Drayton told Deputy Russell that Plaintiff was known to carry knives, run and hide from the police, and had been sending threatening text messages to her through Ms. Rabourn's phone. Ms. Drayton wanted the restraining order against Plaintiff enforced; however, deputies discovered the restraining order had not been served on Plaintiff.

The deputies subsequently reviewed Plaintiff's criminal history and discovered that he had numerous arrests and convictions for domestic violence and resisting arrest/obstructing a police officer. Plaintiff was also on probation. Based upon the information reported by Ms. Drayton, Plaintiff's extensive criminal history, and Plaintiff's reported propensity toward violence, a decision was made to contact Plaintiff in the vacant home and serve Ms. Drayton's restraining order on him.

Deputy Russell, called for assistance in order to enter the home. Deputies Trummel and Frizzie were dispatched. Prior to entering the home the deputies discussed the plan to enter the vacant home and make contact with Plaintiff.  The house had bars on the windows and the front entrance. The garage door had been pulled up in one corner and it appeared that is how people were getting inside. Deputy Frizzie climbed through the opening, then opened the side door for the other deputies. In the garage, the deputies made a plan to enter and search the home.

Prior to entering the home, the deputies made announcements such as "Sheriff's Department, make yourselves known." No one from within responded. When the door was opened, a male was seen fleeing from the living room area to the back of the home. The deputies then conducted a search of the vacant home, making announcements as they were doing it, but no one responded and no one was located. The deputies briefly met and decided to conduct a second search of the home. Because all windows had bars on them, the deputies believed no one would be able to get out of the home and who they saw fleeing was still in the home.

Deputy Russell and Deputy Trummel, with guns drawn, entered the back bedroom of the home to start the second search. Deputy Russell approached a closet and attempted to check inside.  As he began to slide the door open, Plaintiff suddenly came out of the closet. Prior, Plaintiff had not said anything and acknowledged he was trying to hide from the deputies.[1] When Plaintiff suddenly and without warning emerged, he was in such proximity he could have easily either shot Deputy Russell or gained control of his weapon. Given the information Deputy Russell had been provided about Plaintiff through Ms. Drayton, Plaintiff's criminal history, and Plaintiff's observed conduct in trying to evade police, Deputy Russell made the split second decision to fire his weapon. Plaintiff was shot one time in the shoulder. Plaintiff subsequently fell to the ground. Plaintiff was thereafter provided medical aid for the gunshot wound.

Plaintiff now brings this lawsuit alleging Deputy Russell used unreasonable force against him in violation of the Fourth Amendment. He further alleges state law causes of actions against Deputy Russell for a Bane Act violation, battery, and negligence.

Plaintiff's Complaint should be dismissed in its entirety. The undisputed material facts demonstrate that Deputy Russell's conduct was objectively reasonable given the totality of the circumstances. Further, Deputy Russell did not violate clearly established law and is entitled to qualified immunity. Given that Deputy Russell is not liable, Plaintiff's claims against the entity Sacramento County Defendant also fail as a matter of law.

///

///

---

[1] Plaintiff claims he decided to come out because he heard announcements there was a dog and did not want to be bitten. The deputies did not have a dog.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

## II.

## PROCEDURAL BACKGROUND

Plaintiff filed his operative Complaint on July 26, 2018.   [EFC 1.]   Prior to filing the instant Motion, the parties met-and-conferred, as required by this Court's Standing Order. Plaintiff's counsel advised that Plaintiff is only proceeding on claims from his operative Complaint as follows: (1) First Claim: § 1983 claim against Deputy Russell, based exclusively on excessive force in violation of the Fourth Amendment; (2) Second Claim: violation of the Bane Act only against Deputy Russell; (3) Fourth Claim: Battery; (4) Fifth Claim: Negligence.[2] UMF 1. This Motion addresses each of Plaintiff's remaining claims.

## III.

## FACTUAL BACKGROUND

### A.   Erika Drayton Reported Seeing Plaintiff With a Firearm

On June 13, 2017 at approximately 7:20 p.m., Deputy Russell and Deputy Rowe of the Sacramento County Sheriff's Department responded to a call for service for a restraining order violation at 6636 Doreen Way, Sacramento, California and made contact with Erika Drayton. UMF 2. Ms. Drayton reported that her ex-boyfriend, Plaintiff, walked by her mother's home and she believed he had a firearm in his waistband. UMF 3. Plaintiff knew that Ms. Drayton moved back in with her mom, Carrie Rabourn, in May of 2017, and that Plaintiff knew the location of Ms. Rabourn's home because he had been there in the past. UMF 4.

Ms. Drayton advised the deputies that she followed Plaintiff in her vehicle and saw him enter 5208 53rd Ave., Sacramento, California (hereinafter "vacant home"). UMF 5. Ms. Rabourn's house is approximately .40 miles from the vacant home. UMF 6. Ms. Drayton reported Plaintiff was known to go into the vacant home.  UMF 7.

### B.   Plaintiff Has a Violent History

Ms. Drayton and Ms. Rabourn informed deputies that they were in fear for their safety after seeing Plaintiff walk by their house. UMF 8. Ms. Drayton told the deputies that she and Plaintiff broke up in May of 2017 after she had been a victim of Plaintiff's domestic violence assaults in March and

---

[2] Defendants request the Court summarily dismiss the remaining claim of Individual Liability/Ratification (3rd Claim).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

May of 2017. UMF 9. Ms. Drayton reported that Plaintiff broke her nose during one of those incidents. *Id.* Ms. Drayton advised that the police arrested Plaintiff after he assaulted her in both March and May of 2017. UMF 10. She told the deputies that she knew Plaintiff to carry knives, run and hide from police, and believed he was a violent person. UMF 11. Ms. Drayton and Ms. Rabourn also reported that Plaintiff had been sending threatening text messages to Ms. Rabourn's phone. UMF 12.

### C. Ms. Drayton Had An Unserved Restraining Order

Ms. Drayton advised deputies that she requested a Domestic Violence Restraining Order on May 8, 2017 and it was granted. UMF 13. The deputies reviewed information in their computer system and learned that Ms. Drayton's Domestic Violence Restraining Order had not been served on Plaintiff. UMF 14. Deputies Russell and Rowe also reviewed Plaintiff's criminal history, which disclosed that Plaintiff had sustained arrests and/or convictions on domestic violence charges, as well as resisting arrest/obstructing a peace officer. UMF 15. Plaintiff was also identified as being on probation. *Id.* As of May of 2019, Plaintiff also had pending criminal charges for assaulting Ms. Drayton. UMF 16.

### D. Deputies Decided to Attempt to Serve Ms. Drayton's Restraining Order on Plaintiff Due to His Violent History

Given Plaintiff's violent history toward Ms. Drayton, the reported threats to Ms. Drayton and her mother, Plaintiff potentially being armed with a firearm, and his close proximity to Ms. Drayton and Ms. Rabourn's house, the deputies decided to make contact with Plaintiff at the vacant home to serve Ms. Drayton's restraining order. UMF 17. Deputy Russell was familiar with the vacant home, and knew it to be vacant, because he had responded there a month earlier to investigate a transient who was reported as a trespasser. UMF 18. Subsequently, Deputy Russell requested assistance and Deputy Frizzie and Deputy Trummel were dispatched to help enter the home and make contact with Plaintiff inside the vacant home. UMF 19.

### E. Deputies Devised a Plan to Contact Plaintiff Inside the Vacant Home

Deputy Frizzie and Trummel met Deputy Russell and Deputy Rowe in front of the vacant home, where they devised a plan which involved all four deputies entering the home. UMF 20. The attached garage door had been lifted up in one corner, and it was apparent that it was being used to enter the home. UMF 21. Deputy Frizzie, climbing under the lifted-up section, then opened the side garage door

{02038784.DOCX}                                    4

for the other deputies. UMF 22. Once inside the garage, the deputies discussed entering the home and conducting a search. UMF 23. The four deputies then lined up alongside the wall near the door leading into the interior of the home. *Id.* While lined up, the deputies made several announcements, including: "Sheriff's Department, make yourself known." UMF 24. After hearing no response from within, the deputies opened the door leading from the garage into the interior of the vacant home while continuing to make announcements. UMF 25.

### F.  **Plaintiff Intentionally Ran and Hid From the Deputies**

Upon opening the interior door, the deputies observed a male subject flee from the living room to the back area of the vacant home. UMF 26. Plaintiff admitted to standing in the living room area of the vacant home when he saw the police open the interior garage door. UMF 27.

At that time, Plaintiff knew he was on probation for a domestic violence conviction and believed he had a warrant out for his arrest for not checking into probation. UMF 28. When he saw the interior door open in, Plaintiff believed he was going to get arrested on an outstanding domestic violence probation warrant for not checking into probation. UMF 29. Plaintiff, believing he was going to get arrested and in a state of panic, ran into a closet in a bedroom in the back of the vacant house (hereinafter "back bedroom"). UMF 30. Plaintiff ran into the closet to hide because he did not want to go to jail. UMF 31.

The closet that Plaintiff ran into has a wall that divides the interior of the closet into a right side and a left side. UMF 32. If one were standing inside the left side of the closet, he or she would not be able to see into the closet on the right side. *Id.* The closet also had sliding doors. *Id.* Plaintiff ran into the left side of the closet. UMF 33. Plaintiff hid by standing sideways on the left side of the closet, with his back against the interior divider in the closet, facing the exterior window. UMF 34. Plaintiff heard the deputies announce "Sheriff's Department" while he was standing in the closet. UMF 35. Plaintiff believed that the deputies had their firearms on them the night of the incident. UMF 36.

### G.  **Deputies Conduct First Search of Vacant Home**

After the deputies observed Plaintiff run toward the back of the house, they conducted a search of all the rooms of the home. UMF 37. At the conclusion of that first search, they did not find the fleeing subject. *Id.* The deputies then met and agreed to conduct another search of the vacant home, this time

being more thorough, since they believed that there were no doors or windows that would have allowed the fleeing subject to exit home as everything had bars on it. UMF 38.

### H. **Plaintiff Came Out of the Closet Without Any Announcement and Within a Couple of Feet of Deputy Russell**

Deputy Russell and Deputy Trummel subsequently entered the back bedroom to start conducting the second search, where, unbeknownst to them, Plaintiff was hiding on the left side of the closet in that room. UMF 39. There was no artificial lighting source in the back bedroom when Deputy Russell searched the room. UMF 40.

While he was in the closet, Plaintiff claims he heard two deputies yell "clear" and then claims to have heard someone say: "get the dog." UMF 41. At that point, Plaintiff claims he decided to come out of the closet because he did not want to get bit by the dog. UMF 42.

Plaintiff acknowledged that he was exiting the closet, with one foot placed on the floor outside of the closet, when he first saw Deputy Russell. UMF 43.[3]



Plaintiff never said anything to the deputies before coming out of the closet. UMF 44. When Plaintiff emerged from his concealed location in the closet, Deputy Russell was standing with his firearm extended in front of him within three feet of Plaintiff. UMF 45.

---

[3] For the Court's ease of reference, Defendants provide "Exhibit B" from Plaintiff's deposition, where Plaintiff drew an "X" in front of the closet to indicate where he placed his foot when he came out of the closet. The "X" is circled in yellow. This is included in Defendants' Appendix of Exhibits as <u>Exhibit D</u>.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

The first things Plaintiff saw when came out of the closet was someone standing with a gun and a flash of light, then he was immediately shot. UMF 46. Plaintiff stated he had his hands near his ears, palms facing out, with a lighter in his right hand. UMF 47.

## I.   Deputy Russell Shot Plaintiff in Fear for His Life

Deputy Russell's intention was to clear the back bedroom, which included looking into the closet. UMF 48. Deputy Russell approached the closet and began sliding open the door. UMF 49. Just at that moment, Plaintiff suddenly stepped out of the closet. UMF 50.

When Deputy Russell saw Plaintiff coming toward him out of the closet, Deputy Russell was in fear of his life or serious bodily injury given the following circumstances known to Deputy Russell at the time: (1) Plaintiff was reported to have a history of running from police; (2) a person in the house intentionally ran and hid from police; (3) Plaintiff gave no verbal announcements and did not verbally respond to commands such as "make yourself known!"; (4) Plaintiff concealed his whereabouts prior to exiting the closet; (5) Plaintiff was potentially armed with a firearm; (6) Plaintiff was reported to be violent and known to carry knives; (7) Plaintiff previously sustained arrests and convictions for violent crimes and was on probation at the time of the incident; (8) Plaintiff known to have convictions for resisting arrest/obstructing police; and (9) Plaintiff abruptly exited the closet in a manner and proximity that allowed him to easily shoot Deputy Russell or grab Deputy Russell's firearm. UMF 51. Deputy Russell shot Plaintiff one time, hitting Plaintiff in his right shoulder. UMF 52.

### IV.

## LEGAL AUTHORITY

Federal Rules of Civil Procedure, Rule 56 provides that summary judgment must be granted where there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A fact is material if, according to the underlying substantive law, it is relevant to an element of a claim or a defense and its existence might affect the outcome of the suit. *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (1987). The moving party bears the initial burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden on the moving party may be discharged by pointing out that there is an absence of evidence to support the nonmoving party's

1  case. *Id*. at 325.

2      If the moving party has properly supported its motion, the burden shifts to the nonmoving party,

3  who may not rest on the mere allegations plead. *Celotex Corp*., 477 U.S. at 325. The nonmoving party

4  must set forth specific facts showing that there is a genuine issue for trial, proffering more than a mere

5  scintilla of evidence. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251 (1986).

6  There are no issues for trial unless sufficient evidence in favor of the nonmoving party would allow a

7  jury to return a verdict for that party. *Id*. A nonmoving party must show more than some metaphysical

8  doubt as to the material facts. *Matsushita Electric Industrial Co., LTD v. Zenith Radio Corp*., 475 U.S.

9  574, 586 (1986). If the evidence is merely colorable or is not significantly probative, the court may grant

10  summary judgment. *Anderson*, 477 U.S. at 249-250.

11                                         **V.**

12  **PLAINTIFF'S FIRST CLAIM FOR RELIEF FOR EXCESSIVE FORCE AGAINST DEFENDANT RUSSELL FAILS AS A MATTER OF LAW BECAUSE HIS ACTIONS WERE**

13  **OBJECTIVELY REASONABLE UNDER THE TOTALITY OF THE CIRCUMSTANCES**

14      Plaintiff's first claim for relief is alleged against Defendant Russell pursuant to 42 U.S.C. section

15  1983. Plaintiff alleges Russell violated his Fourth Amendment rights by using excessive force.  Pursuant

16  to 42 U.S.C. section 1983: "Every person who, under color of any statute, ordinance, regulation, custom,

17  or usage, of any State…subjects, or causes to be subjected, any citizen of the United States or other

18  person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured

19  by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or

20  other proper proceeding for redress…"

21      In general, claims of excessive force, whether deadly or not, should be analyzed under the

22  objective reasonableness standard of the Fourth Amendment as applied in *Scott v. Harris*, 550 U.S. 372

23  (2007), *Graham v. Connor*, 490 U.S. 386, 397 (1989), *Tennessee v. Garner*, 471 U.S. 1 (1985), and

24  *Acosta v. Hill*, 504 F.3d 1323 (9th Cir. 2007). An officer may use deadly force "[w]here the officer has

25  probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or

26  to others.'" *Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010) (quoting *Garner*, 471 U.S. at 11).

27  Whether the use of deadly force is reasonable is highly fact-specific. *Id.*

28      In assessing reasonableness, the court considers the specific circumstances of each particular

case, including whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest. See, *Graham*, 490 U.S. at 396. The Ninth Circuit has repeatedly emphasized that the most important factor is "whether the suspect posed an immediate threat to the safety of the officers or others." See, e.g., *S.B. v. County of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017) (internal quotation marks omitted). If deadly force is used the officer must have "probable cause to believe that the suspect poses a significant threat of death or serious physical injury." *Garner*, 471 U.S. at 3.

The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight. *Graham,* 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-397. Only information known to the officer at the time the conduct occurred is relevant. *Cty of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546-1547 (2017).

Here, Deputy Russell responded to a call for service where he learned from Plaintiff's ex-girlfriend Ms. Drayton that Plaintiff was observed walking by her mother's home and she believed he had a firearm in his waistband. UMFs 2 and 3. She proceeded to tell the deputies that she was in fear for her safety because Plaintiff may have a firearm in his waistband and had physically assaulted her twice within the four previous months. UMFs 8-10. During one of those incidents, Ms. Drayton reported that Plaintiff broke her nose. UMF 9. Ms. Drayton reported that Plaintiff had been arrested for both of those domestic violence incidents, was known to run and hide from police, and carried knives on him. UMFs 10-11. Ms. Drayton and Ms. Rabourn also reported that Plaintiff had been sending threatening text messages to Ms. Rabourn's phone. UMF 12. As a result of Plaintiff's violent conduct toward Ms. Drayton, she told the deputies that she had a Restraining Order against Plaintiff. UMF 13.

Deputy Russell reviewed Plaintiff's criminal history and discovered that Plaintiff had arrests and convictions for domestic violence violations and resisting arrest/obstructing a police officer. UMF 15. Deputy Russell also saw that Ms. Drayton had a Restraining Order against Plaintiff, but it had not been served on Plaintiff. UMF 14.

Ms. Drayton informed Deputy Russel that she observed Plaintiff enter the vacant home after he walked by her house with a firearm. UMF 5. Deputy Russell, with the assistance of three other deputies, decided to contact Plaintiff at the vacant home due to Plaintiff's violent history toward Ms. Drayton, the reported threats to Ms. Drayton and her mother, Plaintiff being armed with a firearm, and his close proximity to Ms. Drayton and her mother's home. UMF 17.

After making announcements in the attached garage and hearing no response from within, the deputies entered the interior home of the vacant home and observed a male subject immediately flee toward the back of the home. UMFs 24-27 and 30-31. The officers conducted a search of the home and did not locate the fleeing subject. UMF 37. It was evident that the fleeing subject was likely not able to exit the home and was intentionally hiding from the four deputies. UMF 38. As a result, the deputies decided to conduct a second search of the vacant home. UMF 39.

Deputy Russell and Deputy Trummel started the second search in the back bedroom of the house. UMF 39. At this point, Deputy Russell knew someone was intentionally hiding from them and had made no effort to make their concealed location known. Plaintiff admits to hearing deputies' announcements about being from the Sheriff's Department, yet he made no announcement about his hidden location. UMF 35 and 44.

Deputy Russell had information to believe that Plaintiff was in the vacant home and had a history of evading police. UMFs 5, 7, 11, and 15. If contacted, Deputy Russell knew that Plaintiff had a criminal history of arrests and convictions for domestic violence crimes, as well as resisting arrest. UMF 15. Deputy Russell also reasonably believed that Plaintiff could be armed with a firearm, carrying a knife, or capable of physically assaulting him given his reported violent history with Ms. Drayton. UMF 3, 9-11, and15.

Plaintiff admits that he simultaneously came out of the closet when Deputy Russell was two or three feet away. UMF 45. Indeed, the first two things Plaintiff saw before he was shot was Deputy Russell holding a gun and a white light. UMF 46.

Significantly, Plaintiff emerged from his hidden location without any prior announcement. UMF 44. When Plaintiff took a step out of the closet, he was two or three feet away from Deputy Russell and continuing to move toward Deputy Russell's position. UMFs 43, 45, and 50. At that point, Deputy

{02038784.DOCX}                                      10

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

Russell was forced to make a split-second decision. Plaintiff was in a close enough proximity to easily shoot Deputy Russell, if he had a firearm, or take control of Deputy Russell's firearm. UMF 51. Further, Deputy Russell knew the subject confronting him had intentionally evaded the deputies and had reason to believe Plaintiff was inside that vacant home. *Id.* Given the information provided by Ms. Drayton, Plaintiff's violent criminal history, his intentional evasive conduct, the manner and timing in which Plaintiff emerged from the closet, and that immediate and dangerous proximity Plaintiff was to Deputy Russell, it was objectively reasonable for Deputy Russell to believe that Plaintiff posed an immediate threat of death or serious physical injury. *Id.* Accordingly, Deputy Russell's use of force under the totality of the circumstances was reasonable and Defendants' Motion for Adjudication as to Plaintiff's First Claim for Relief should be granted.

## VI.

## <u>DEPUTY RUSSELL IS ENTITLED TO QUALIFIED IMMUNITY</u>

In determining whether an officer is entitled to qualified immunity, the Court considers: (1) whether there has been a violation of a constitution right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct. *C.V. by and through Villegas v. City of Anaheim*, 823 F.3d 1252, 1255 (9th Cir. 2016). The Supreme Court has pointed out that courts may determine which prong of qualified immunity they should analyze first. *Pearson v. Callahan,* 555 U.S. 223, 236-237 (2009). Addressing the second prong before the first is especially appropriate where the court will rather quickly and easily decide there is no violation of clearly established law. *Id.* at 239.

Qualified immunity is a question of law to be decided by the court. *Hunter v. Bryant,* 502 U.S. 224, 228 (1991); *Torres v. City of Los Angeles,* 548 F.3d 1197, 1210 (9th Cir. 2008). The plaintiff bears the burden of showing that the rights allegedly violated were clearly established. *Shafer v. County of Santa Barbara,* 868 F.3d 1110, 1118 (9th Cir. 2017).

Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights which a reasonable officer would have known. *Kisela v. Hughes,* 138 S. Ct. 1148, 1152 (2018), citing to *White v. Pauly,* 137 S. Ct. 548, 551 (2017). Because the focus is on whether the officer had fair notice that his/her conduct was unlawful, reasonableness is judged from the backdrop of the law at the time of the conduct. *Kisela,* 138 S. Ct. at 1152.

The Supreme Court's case law does not require a case directly on point for a right to be clearly established; however, existing precedent must have placed a statutory or constitutional question beyond debate. *Kisela,* 138 S. Ct. at 1152. See also *S.B.,* 864 F.3d at 1015, stating that precedent must put the defendant on clear notice that using deadly force in the particular circumstances would be excessive. In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law. *Kisela,* 138 S. Ct. at 1152. The Supreme Court has repeatedly told courts, and the Ninth Circuit in particular, not to define "clearly established" at a high level of generality. *Id.,* citing *City and County of San Francisco v. Sheehan* 135 S. Ct. 1765, 1775-1776 (2015). Clearly established law must be "particularized" to the facts of the case. *Pauly,* 137 S. Ct. at 552, citing to *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S. Ct. 3034 (1987). See also *City of Escondido v. Emmons,* 139 S. Ct. 500, 503 (2019), stating that under Supreme Court precedent, the clearly established right must be defined with specificity.

Specificity is especially important in the Fourth Amendment context, where the court has recognized that it is difficult for an officer to determine how the law on excessive force will apply to the factual situation the officer confronts. *City of Escondido,* 139 S. Ct. at 503, citing to *Kisela,* 138 S. Ct. at 1152 (2018); *District of Columbia v. Wasby,* 135 S. Ct. 577, 593 (2018); *Pauly,* 137 S. Ct. at 551; and *Mullenix v. Luna,* 136 S. Ct. 305, 308 (2015). An officer is entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue. *Kisela,* 138 S.Ct. 1153, citing to *Mullenix,* 136 S. Ct. at 305.

The general rules set forth in *Tennessee v. Gardner,* 471 U.S. 1 (1985) and *Graham v. Connor,* 490 U.S. 386 (1989), do not by themselves create clearly established law outside of the obvious case. See *Kisela,* 138 S. Ct. at 1153. An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in defendant's shoes would have understood that he or she was violating it. *Id.,* citing *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014).  The Ninth Circuit has expressly acknowledged the Supreme Court. See *S.B.,* 864 F.3d at 1015-1016 ("We hear the Supreme Court loud and clear. Before a court can impose liability on [defendant], we must identify precedent as of [the date of the incident] that put [defendant] on clear notice that using deadly force in these particular circumstances would be excessive"); see also *Shafer v*

*County of Santa Barbara,* 868 F.3d 1110, 1117 (9th Cir. 2018) ("We are mindful of the Supreme Court's pronouncement in *White v. Pauly* that to satisfy this step into qualified immunity analysis, we generally must 'identify a case where an officer acting under similar circumstances as [defendant] was held to have violated the Fourth Amendment'").

Here, there was no clearly established law that would have put Deputy Russell on notice his conduct would have violated Plaintiff's rights. Indeed, the evidence shows that despite knowing that deputies were in the house looking in the bedrooms, Plaintiff hid from the deputies in a back bedroom closet. UMFs 27-31 and 34-35. The deputies believed that Plaintiff was potentially armed with a firearm and previously reviewed his criminal history, which revealed violent tendencies toward domestic violence victims and resistance toward peace officers. UMFs 3, 5, 9-11, and 15. When Deputy Russell checked inside the closet where Plaintiff was hidden, Plaintiff admits to simultaneously coming out of the closet. UMFs 45 and 50. He further admits to not making any announcements before exiting the closet as to give the deputies notice of his concealed location. UMF 44. Plaintiff admits that he had one foot outside of the closet when he and Deputy Russell were within three feet of each other outside the closet. UMF 43 and 45.

At the time of the shooting, Plaintiff's conduct elevated the severity of the situation by refusing to avail himself to police presence, intentionally concealing himself in a closet, and exiting the closet within feet of Deputy Russell, having made no verbal announcements of his whereabouts or intention to peacefully exit from his concealed location. Deputy Russell had information that Plaintiff was inside the vacant home, had a violent criminal history, and could be armed with a firearm or knives. UMF 51. Under the totality of these circumstances, given how quickly events unfolded, Deputy Russell's use of deadly force cannot be said to have been "plainly incompetent" for believing his life was in immediate danger. See *Sheehan* 135 S. Ct. at 1774. Thus, he is entitled to qualified immunity.

### VII.

### PLAINTIFF CANNOT SUSTAIN A BANE ACT CLAIM

California Civil Code section 52.1(a) provides: "If a person or persons, whether or not acting under the color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights

secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the State of California." Section 52.1(b) provides "Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (a), may institute and prosecute in his or her own name, and on his or her own behalf, a civil action for damages."

The elements of an excessive force claim under California's Bane Act are generally the same as under § 1983. *Boarman v. County of Sacramento,* 55 F.Supp.3d 1271 (E.D. Cal. 2014). *Wallisa v. City of Hesparia,* 369 F.Supp.3d 990 (C.D. Cal. 2019). However, the Court in *Cornell v. City and County of San Francisco* 17 Cal.App.5th 766 (2017) made clear that to sustain a Bane Act claim Plaintiff must prove the officer had a specific intent to violate the arrestee's right to freedom from unreasonable seizure. See also *Reese v. County of Sacramento,* 888 F.3d 1030, 1043 (9th Cir. 2018).

Here, as previously discussed, Deputy Russell's use of force was objectively reasonable under the totality of the circumstances and did not violate Plaintiff's rights. Further, there is no evidence that Deputy Russell acted with specific intent to violate Plaintiff's rights to be free of excessive force. Deputy Russell entered a vacant house looking for Plaintiff, who was reported to be armed with a firearm or knife, had a history of violent criminal behavior, and was reported to have recently threatened his ex-girlfriend. UMFs 3, 5, 9-11, 15, and 17. Upon entering the house, deputies observed an individual run and hide in a concealed location in the house. UMF 26. Deputies searched the home as to avoid being ambushed by a potentially armed individual in the home. Upon searching a closet in the back bedroom, Plaintiff contemporaneously stepped out of the closet, within feet of Deputy Russell and without previous verbal warning. UMFs 43, 45 and 50. Even if, hypothetically, Deputy Russell's conduct violated Plaintiff's rights, there is no evidence Deputy Russell acted with the specific intent to interfere with their rights. It is impossible for Deputy Russell to have acted with a specific intent to violate Plaintiff's rights given that Deputy Russell did not violate any clearly established right.  Also, it is impossible to conclude that Deputy Russell had a specific intent when he was forced to make a split second decision. Thus, Plaintiff's Bane Act claim must be dismissed.

1

## VIII.

## THE BATTERY CLAIM FAILS

Plaintiff's Fourth Claim alleges battery against Deputy Russell. "A state law battery claim is a counterpart to a federal claim of excessive use of force. In both, a plaintiff must prove that the peace officer's use of force was unreasonable." *Brown v. Ransweiller*, 171 Cal.App.4th 516, 527 (citing *Munoz v. City of Union City*, 120 Cal.App.4th 1077, 1102 n.6 (2004)). "A police officers use of deadly force is reasonable if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Brown*, 171 Cal.App.4th at 528. Accordingly, this claim is analyzed the same as Plaintiff's § 1983 excessive force claim. For the reasons stated in Section V, Deputy Russell's use of force was objectively reasonable under the totality of the circumstances.

## IX.

## THE NEGLIGENCE CLAIM FAILS

Plaintiff's Fifth Claim for Relief for negligence is alleged against Deputy Russell and further alleges that Defendant County of Sacramento is indirectly and vicariously liable for his actions. Negligence requires showing: (1) a duty to use due care; (2) a breach of that duty; (3) proximate or legal causation; and (4) damages resulting from the breach. *Ladd v. Cty. of San Mateo*, 12 Cal.4th 913, 917 (1996).

"Although an officer must always act reasonably when using lethal force, what reasonable means differs in Fourth Amendment and state negligence contexts." *Brown,* 171 Cal.App.4th at 534 (quotation omitted). State negligence claims "consider the totality of the circumstances surrounding any use of deadly force," whereas federal excessive force claims "focus more narrowly on the moment when force is used . . . ." *Hayes v. City of San Diego*, 57 Cal.4th 622, 638 (2013) At the same time, akin to federal courts' evaluation of Fourth Amendment excessive force claims, California negligence law evaluates reasonableness from the perspective of an officer on the scene; not "with the 20/20 vision of hindsight." *Id*. at 638 (quoting *Graham,* 490 U.S. at 396). Thus, "[l]aw enforcement personnel have a degree of discretion as to how they choose to address a particular situation." *Id.* If they act within "the range of conduct that is reasonable under the circumstances" there is no requirement that they choose the "most reasonable" action or the conduct that is the least likely to cause harm" to avoid negligence liability. *Id.*

{02038784.DOCX}                                     15

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

"Reasonableness" under the Fourth Amendment and "reasonable care" under a negligence theory are synonymous insofar as they consider the same conduct. See *Hernandez v. City of Pomona*, 46 Cal.4th 501, 513-517 (2009); *Atkinson v. Cty. of Tulare*, 790 F.Supp.2d 1188, 1211 (E.D. Cal. 2011) (negligence and battery "measured by the same reasonableness standard of the Fourth Amendment") (citing *Edson v. City of Anaheim*, 63 Cal.App.4th 1269, 1272-1273 (1998)).

Here, as discussed extensively above, Deputy Russell's conduct under the totality of the circumstances was reasonable. Deputies responded to a vacant home where it was reported that a potentially armed male, with a violent criminal history, who had recently threatened an ex-girlfriend had entered the home. UMFs 3, 5, 9-11, and 15. After obtaining information from the reporting party and retrieving Plaintiff's criminal history, the deputies decided to enter the vacant home to contact Plaintiff and serve him with a restraining order. UMF 17. At that point, it was also clear that Plaintiff had no lawful business being inside the vacant home. UMFs 18 and 53-54.

The deputies first made their way into the interior of the garage, where they made Sheriff's Department announcements to anyone in the home. UMF 20-24. When no one responded from within, they entered the home and observed an individual run away from them toward the back of the vacant home. UMFs 25-26. The individual then intentionally concealed himself in an unknown location. UMF 27-34, and 44. At no point did Plaintiff communicate his location to the deputies. UMF 44. Under such circumstances, there is no authority that requires the deputies to retreat into a position that leaves Plaintiff's whereabouts unknown or puts the deputies in a vulnerable position to deadly attack by an individual that was reported to be armed with a firearm or knife. The deputies here should be afforded discretion in how to handle a fleeing individual, known to be violent, and dangerous.

Deputies conducted an initial search of all of the rooms in the house, but were unable to locate the fleeing subject. UMF 37. Subsequently, the deputies agreed to conduct a more thorough search of the home to look for the fleeing subject. UMF 38. While Deputy Russell was conducting a search of the back bedroom closet, Plaintiff stepped out of the closet without any verbal announcements. UMFs 43-45, and 50. Plaintiff and Deputy Russell were within three feet from each other. UMF 45. Believing Plaintiff could have been armed with a firearm or knife, and based on the manner and proximity in which Plaintiff emerged from the closet paired with Plaintiff's reported conduct by Ms. Drayton, Deputy

Russell shot Plaintiff in fear for his life. UMF 51. Plaintiff's likely suggestion that, in hindsight, the deputies could have devised a better plan is insufficient to demonstrate that the plan they devised under the totality of the circumstances was unreasonable. This is especially true given the evolving, tense circumstances the deputies confronted when Plaintiff intentionally ran and hid. See UMFs 26-31. Accordingly, Plaintiff's negligence claim should be dismissed.

## X.

## CONCLUSION

For the reasons stated above, Defendants COUNTY OF SACRAMENTO, SCOTT JONES, and DEPUTY RUSSELL respectfully request the Court grant their Motion for Summary Judgment and dismiss Plaintiff's Complaint against them in its entirety.

Dated:  March 12, 2020                          PORTER SCOTT
                                                A PROFESSIONAL CORPORATION

                                                By  /s/ Carl L. Fessenden
                                                    Carl L. Fessenden
                                                    Barakah M. Amaral
                                                    Attorneys for Defendants
                                                    COUNTY OF SACRAMENTO,
                                                    SCOTT JONES, and NICHOLAS
                                                    RUSSELL

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT