**PORTER | SCOTT**

A PROFESSIONAL CORPORATION
Carl L. Fessenden, SBN 161494
Barakah M. Amaral, SBN 298726
350 University Ave., Suite 200
Sacramento, California 95825
TEL: 916.929.1481
FAX: 916.927.3706

Attorneys for Defendants
COUNTY OF SACRAMENTO, SCOTT JONES, and NICHOLAS RUSSELL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

KENARD THOMAS,

        Plaintiff,

v.

COUNTY OF SACRAMENTO; SCOTT
JONES; and NICHOLAS RUSSELL,

        Defendants.

_____/

CASE NO. 2:18-CV-02048 JAM-DB

**APPENDIX OF EXHIBITS IN SUPPORT
OF DEFENDANTS' MOTION AND
MOTION FOR SUMMARY JUDGMENT,
OR IN THE ALTERNATIVE,
SUMMARY ADJUDICATION**

**DATE:**
**TIME:    1:30 p.m.**
**CTRM:   6, 14th Floor**
**JUDGE:  Hon. John A. Mendez**

Complaint Filed:  07/26/2018

        Defendants COUNTY OF SACRAMENTO, SCOTT JONES, and NICHOLAS RUSSELL

hereby submit the following Appendix of Exhibits in Support of Their Motion for Summary

Judgment or, in the alternative, Summary Adjudication:

///

///

///

///

///

///

{02038796.DOCX}                                    1

PORTER |SCOTT
350 University Ave., Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

| Exhibit | Description |
|---------|-------------|
| A | Plaintiff's Operative Complaint |
| B | Plaintiff's counsel's Email Correspondence Re: Remaining Claims |
| C | Excerpts and Referenced Exhibits from Plaintiff's Deposition |
| D | "Exhibit B" to Plaintiff's Deposition |
| E | Relevant Excerpts from Defendant's Request for Admissions served on Plaintiff |
| F | Relevant Excerpts from Plaintiff's Responses to Defendant's Request for Admissions |
| G | Photo of Lifted Garage Door on Vacant Home |
| H | Declaration of Nicholas Russell |
| I | Declaration of Carl Fessenden |

Dated:  March 12, 2020

PORTER SCOTT
A PROFESSIONAL CORPORATION

By  _/s/ Carl L. Fessenden_
       Carl L. Fessenden
       Barakah M. Amaral
       Attorneys for Defendants
       COUNTY OF SACRAMENTO,
       SCOTT JONES, and NICHOLAS
       RUSSELL

PORTER | SCOTT
350 University Ave., Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

{02038796.DOCX}                    2
APPENDIX OF EXHIBITS IN SUPPORT OF DEFENDANTS' MOTION AND MOTION FOR SUMMARY
JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION

# EXHIBIT A

**LAW OFFICE OF STEWART KATZ**
STEWART KATZ, State Bar #127425
555 University Avenue, Suite 270
Sacramento, California 95825
Telephone: (916) 444-5678

Attorney for Plaintiff
KENARD THOMAS

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENARD THOMAS, | NO. |
| Plaintiff, | **COMPLAINT FOR VIOLATION OF CIVIL RIGHTS AND STATE LAW** |
| vs. | **[42 U.S.C. § 1983 - Excessive Force; Monell Liability; Negligence, Battery; Bane Act]** |
| COUNTY OF SACRAMENTO; SCOTT JONES; and NICHOLAS RUSSELL, | |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff complains and alleges as follows:

### I. JURISDICTION

1.     This complaint seeks damages and attorney's fees pursuant to Title 42 U.S.C. sections 1983 and 1988, for the violation of plaintiff's civil rights. Jurisdiction is founded upon Title 28 U.S.C. sections 1331 and 1343. This court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. section 1367.

### II. VENUE

2.     Plaintiff's claims alleged herein arose in the City and County of Sacramento, California.  Therefore, venue lies in the Eastern District of California pursuant to 28 U.S.C. section 1391(b)(2).

Thomas - Complaint for Damages                    1

### III. INTRODUCTION

3.      This is a federal civil rights action with supplemental state law claims arising from the unlawful and unjustified shooting of Kenard Thomas, an unarmed black, male adult. Thomas was shirtless at the time and holding only a disposable lighter. No reasonable officer could have confused the disposable lighter for a firearm or any other type of weapon.

### IV. PARTIES

4.      During all times mentioned in this Complaint, plaintiff Kenard Thomas was, and is, a United States citizen and is a resident of the County of Sacramento, California.

5.      Defendant County of Sacramento is a public entity within the definition of California Government Code section 811.2. Pursuant to California Government Code section 945, public entities are subject to suit. Defendant County of Sacramento operates and manages the Sacramento County Sheriff's Department.

6.      Defendant Scott Jones is the Sheriff of the County of Sacramento. At all relevant times he was acting within the course and scope of his position and under color of state law. Jones is being sued in his individual and official capacity.

7.      Defendant Nicholas Russell (Badge #1258) was employed by the County of Sacramento as a Sacramento County Sheriff's Department Deputy. At all relevant times he was acting in the course and scope of that employment and under color of state law. Russell is being sued in his individual capacity.

### V. EXHAUSTION OF GOVERNMENT TORT CLAIM PROCEDURES

8.      Plaintiff filed a timely government tort claim with the County of Sacramento as a prerequisite to the state law claims alleged herein.

9.      That claim was filed on November 9, 2017, and has been acknowledged but not acted upon by the County of Sacramento. As more than 45 days have passed since the filing of the claim, that claim may be deemed rejected by operation of law.

### VI. FACTUAL ALLEGATIONS

10.     Plaintiff Kenard Thomas is a dark-skinned, black male who, at the time of this incident, stood 5'9" tall and weighed approximately 160 pounds.

1       11.    On the evening of June 13, 2017, at approximately 8:00 p.m., Thomas was at an

2   apparently unoccupied residence on 53rd Avenue in Sacramento when multiple Sacramento

3   County deputies came to that address to contact him. On information and belief, the deputies

4   were responding to a call from Thomas's former girlfriend, who had called regarding her

5   belief that Thomas had violated a restraining order.

6       12.    When the deputies arrived, Thomas retreated to a closet in an attempt to avoid

7   being arrested.

8       13.    The deputies called out that a police dog would be deployed if Thomas did not

9   promptly come out of hiding and surrender.

10       14.    In response to that order, Thomas began to exit the closet. Before Thomas had

11   taken two steps, he was immediately shot by Deputy Russell one time in the upper right arm

12   with a 9 mm. round fired from a Glock 17 semi-automatic handgun.

13       15.    At the time Russell fired the shot, Thomas was shirtless, unarmed, and was not

14   engaging in any assaultive or threatening behavior. He had a plastic disposable lighter which

15   was clearly visible in his hand. It was obvious that Thomas did not pose a risk of harm to

16   any person present.

17       16.    Thomas was taken by ambulance to Kaiser South hospital for treatment of the

18   gunshot wound to his upper right arm.

19       17.    As a result of the shooting, Thomas has suffered significant pain and suffering,

20   permanent disfigurement, loss of use and neurological damage that has prevented and

21   interfered with the use of his arm.

22       18.    The District Attorney did not file *any* criminal charges against Thomas in

23   connection with the shooting.

24       19.    Instead of disciplining Russell, Defendant Jones specifically approved, tolerated

25   and/or ratified his conduct in shooting Thomas by explicitly deciding that the shooting was

26   reasonable, justified and within policy. The Sacramento County Sheriff's Department, under

27   Jones, has never found fault with any deputy for intentionally shooting anyone.

28

Thomas - Complaint for Damages         3

20.     During the seven-plus years that Jones has been Sheriff, approximately a dozen unarmed individuals have been shot by deputies. As to every single intentional officer-involved shooting during that time, Jones has determined that the officer(s) acted properly and that the shooting was consistent with the department's policies.

21.     Sheriff Jones has testified under oath that he gets a full briefing on and reviews every officer-involved shooting.

22.     In regard to this case, on information and belief, Jones discussed this shooting with the Sheriff's Department Inspector General. Jones then personally ratified the unconstitutional shooting when, as a member of the Sheriff's Department's Executive Committee, he approved of the shooting as proper and consistent with department policy.

23.     Jones's ratification of the unconstitutional shooting of Thomas was not an isolated act of ratification. In particular, Sheriff Jones has personally ratified as proper and fully consistent with department policies at least two other police shootings that later resulted in civil verdicts returned against the deputies in the Eastern District of California for civil rights violations based on the deputies' shootings in those civil cases. Those cases are *Reese v. County of Sacramento* (2:13-cv-00559) and *Rose v. County of Sacramento* (2:13-cv-01339).

24.     Sheriff Jones has testified that he personally involved himself in the so-called Internal Affairs review of the shooting at issue in *Rose v. County of Sacramento* by talking to involved individuals before endorsing the shooting by finding it was proper and consistent with policy. There were no significant additional facts that came to light prior to or during trial in *Rose v. County of Sacramento* that were not also apparent at the time of Sheriff Jones's review. In other words, Jones was personally aware of the same facts that a jury determined showed an unconstitutional use of force; Jones, however, determined, as he does in every intentional shooting, that the use of force was proper and consistent with department policy.

///

///

Thomas - Complaint for Damages                    4

# VII. CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION
### Unreasonable Seizure/Excessive Force
**(Violation of the Fourth Amendment to the U.S. Constitution:
Actionable under 42 U.S.C. §1983)**
*(Against Defendant Russell)*

25.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 24, as though fully set forth herein.

26.     The actions of Defendant Russell, as alleged herein, interfered with the exercise and enjoyment of plaintiff's civil rights as guaranteed by the Fourth Amendment to the U.S. Constitution. Specifically, defendant interfered with plaintiff's rights when defendant shot plaintiff who was unarmed and in his own home, under circumstances where plaintiff did not pose an immediate risk of threat to anyone, and there was no objectively reasonable justification for the use of deadly force.

27.     As a direct and proximate result of said acts and/or omissions by defendant, plaintiff suffered unreasonable interference with his personal liberty, physical injury, pain and suffering, humiliation, emotional distress and other injuries.

28.     The aforementioned acts and/or omissions of Defendant Russell were willful, intentional, wanton, reckless and/or accomplished with a conscious disregard of plaintiff's rights entitling plaintiff to an award of punitive damages against Defendant Russell.

## SECOND CAUSE OF ACTION
### Unreasonable Seizure/Excessive Force
**(Violation of the Cal. Constitution Art. I §§ 1, 7, 13 and Cal. Civil Code § 43:
Actionable under Cal. Civil Code § 52.1(b)/Bane Act)**
*(Against Defendants County of Sacramento and Russell)*

29.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 28, as though fully set forth herein.

30.     The actions of Defendants County of Sacramento and Russell, as alleged herein, interfered with the exercise and enjoyment of plaintiff's civil rights as guaranteed by Article I §§ 1, 7 and 13 of the California Constitution. Specifically, defendant interfered with plaintiff's rights when defendant intentionally shot plaintiff who was unarmed and in his

own home, under circumstances where plaintiff did not pose an immediate risk of threat to anyone and there was no objectively reasonable justification for the use of deadly force.

31.     Russell's actions constituted an excessive use of force, a violation of plaintiff's right to bodily integrity, and further interfered with plaintiff's personal rights as guaranteed by § 43 of the California Civil Code.

32.     The County of Sacramento is vicariously liable for the conduct of its agents, all individual defendants named herein.

33.     As a direct and proximate result of said acts and/or omissions by Defendants County of Sacramento and Russell, plaintiff suffered unreasonable interference with his personal liberty, physical injury, pain and suffering, humiliation, emotional distress and other injuries.

34.     The violations of plaintiff's rights as guaranteed by Civil Code § 52.1 (Bane Act) entitles plaintiff to compensatory and punitive damages against Deputy Russell, and attorney fees, all of which are provided for in Civil Code §§ 52.1(b) and 52, and are requested below.

35.     The aforementioned acts and/or omissions of Defendant Russell were willful, intentional, wanton, reckless and/or accomplished with a conscious disregard of plaintiff's rights as secured by Civil Code § 52.1, thereby entitling plaintiff to an award of punitive damages against Defendant Russell pursuant to Civil Code § 52(b)(1).

### THIRD CAUSE OF ACTION
**Individual Liability/Ratification**
**(Actionable under 42 U.S.C. § 1983)**
*(Against Defendants County of Sacramento and Sheriff Jones, individually)*

36.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 35, as though fully set forth herein.

37.     The aforementioned acts of Defendant Russell as alleged herein, including but not limited to shooting plaintiff who was unarmed and in his own home, under circumstances where plaintiff did not pose an immediate risk of threat to anyone and there was no objectively reasonable justification for the use of deadly force, occurred as a result of Defendant Sheriff Jones's ratification of prior unlawful shootings by Sheriff Jones's

1    subordinates. Sheriff Jones's repeated ratification of unlawful shootings by sheriff's deputies
2    has deprived plaintiff of his rights under the United States Constitution as set forth herein.

3        38.     In addition, Sheriff Jones became personally aware of the specific details of the
4    unlawful shooting of plaintiff as alleged herein in that pursuant to Sacramento County
5    Sheriff's Department policy, the circumstances of the shooting were presented to the
6    executive staff of the Sheriff's Department at the executive staff meeting which was
7    presided over by Sheriff Jones.

8        39.     Sheriff Jones knew or should have known that this shooting was unlawful and
9    that it violated plaintiff's constitutional rights. Instead of disciplining Deputy Russell, Jones
10   specifically approved, tolerated and ratified his conduct in shooting plaintiff by determining
11   the shooting was reasonable, justified and within policy. Sheriff Jones took no action as to
12   disciplining Deputy Russell or initiating any kind of needed policy change or additional
13   training.

14       40.     As a direct and proximate result of the aforementioned actions of defendants,
15   plaintiff suffered injuries and damages as alleged herein.

16       41.     The aforementioned acts and/or omissions of Sheriff Jones were willful,
17   intentional, wanton, reckless and/or accomplished with a conscious disregard of plaintiff's
18   rights entitling plaintiff to an award of punitive damages against Sheriff Jones.

19                           **FOURTH CAUSE OF ACTION**
20                            **Battery – California State Law**
                        *(Against Defendants County of Sacramento and Russell)*
21
22       42.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 41, as
     though fully set forth herein.
23
24       43.     The conduct of Defendant Russell, as alleged herein, including but not limited to
     defendant's actions of shooting plaintiff who was unarmed and in his own home, under
25
     circumstances where plaintiff did not pose an immediate risk of threat to anyone and there
26
     was no objectively reasonable justification for the use of deadly force, constituted a battery.
27
         44.     Said conduct was a proximate cause of plaintiff's damages and injuries as alleged
28
     herein.

Thomas - Complaint for Damages               7

45.    The County of Sacramento is vicariously liable for the conduct of its agents, including Defendant Russell.

46.    The aforementioned acts and/or omissions of Deputy Russell were willful, intentional, wanton, reckless and/or accomplished with a conscious disregard of plaintiff's rights entitling plaintiff to an award of punitive damages against Deputy Russell.

**FIFTH CAUSE OF ACTION**
**Negligence – California State Law**
*(Against Defendants County of Sacramento and Russell)*

47.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 46, as though fully set forth herein.

48.    On June 13 2017, plaintiff was owed a duty of care by each defendant.

49.    On the same date, defendants breached the duty of care owed to plaintiff in that defendants negligently caused plaintiff's injury, harm and damage.

50.    In particular, Defendant Russell breached his duty of care by shooting the unarmed Thomas who did not present as an immediate threat to Defendant Russell or any other person.

51.    As a direct and proximate result of the foregoing, plaintiff has suffered, and continues to suffer, mental and emotional distress and is entitled to and demands damages against defendants jointly and severally, including, but not limited to general damages.

52.    The County of Sacramento is vicariously liable for the conduct of its agents, including Defendant Russell.

**VIII. PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for the following relief:

1.    For compensatory, general, pecuniary, economic, non-economic, non-pecuniary and special damages against each defendant, jointly and severally, in the amount proven at trial;

2.    For punitive and exemplary damages against each non-governmental individual who is a named defendant in an amount appropriate to punish defendants and deter others from engaging in similar misconduct;

1        3.  For costs and reasonable attorneys' fees pursuant to 42 U.S.C. section 1988,

2    California Code of Civil Procedure section 1021.5, California Civil Code section 52.1 and as

3    otherwise authorized by statute or law;

4        4.  For such other relief, including injunctive and/or declaratory relief, as the court

5    may deem proper.

6    Dated:  July 26, 2018           Respectfully submitted,

7                    /s/ Stewart Katz

8                    STEWART KATZ
                     Attorney for Plaintiff

9

10    **DEMAND FOR TRIAL BY JURY**

11        Plaintiff Kenard Thomas hereby demands trial by jury.

12

13    Dated:  July 26, 2018           /s/ Stewart Katz
                     STEWART KATZ

14                    Attorney for Plaintiff

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Thomas - Complaint for Damages        9

# EXHIBIT B

Barakah M. Amaral

---

**From:**        Stewart Katz <stewartkatzlaw@gmail.com>
**Sent:**        Thursday, January 30, 2020 11:36 AM
**To:**          Barakah M. Amaral
**Subject:**     Re: Thomas v. County of Sacramento

***External email***

Barakah:

That is an accurate recounting of our conversation/meet and confer regarding the MSJ that you anticipate filing in this case.

Stewart Katz

On Thu, Jan 30, 2020 at 11:14 AM Barakah M. Amaral <bamaral@porterscott.com> wrote:

Hi Stewart,


Thank you for the call.  This email is intended to memorialize our meet-and-confer conversation.  Based on what we discussed, Plaintiff is only moving forward on the following claims:


(1)  First Claim: 1983 claim against Dep. Russel, based exclusively on excessive force in violation of the Fourth Amendment

(2)  Second Claim: violation of the Bane Act, only against Dep. Russell

(3)  Fourth Claim: Battery

(4)  Fifth Claim: Negligence


Plaintiff is not moving forward on any Monell claims, including the entire Third Claim in his Complaint (Ratification).


Please let me know if this is an accurate representation of our conversation.


Thanks again,

*Barakah M. Amaral*

Litigation Associate
T| 916. 929. 1481 x 347 F| 916. 927. 3706

www.PorterScott.com

**From:** Barakah M. Amaral
**Sent:** Thursday, January 30, 2020 7:54 AM
**To:** Stewart Katz <stewartkatzlaw@gmail.com>
**Cc:** Carl Fessenden <cfessenden@porterscott.com>; Anita Tellmann <atellmann@porterscott.com>; Jasmyn S. Scarlett <jscarlett@porterscott.com>
**Subject:** RE: Thomas v. County of Sacramento

Hi Stewart,

I am working remotely today.  Please give me a call on my work cell when you have a chance 

*Barakah M. Amaral*

Litigation Associate
T| 916. 929. 1481 x 347  F| 916. 927. 3706

www.PorterScott.com

**From:** Stewart Katz [mailto:stewartkatzlaw@gmail.com]
**Sent:** Wednesday, January 29, 2020 3:12 PM
**To:** Barakah M. Amaral <bamaral@porterscott.com>
**Cc:** Carl Fessenden <cfessenden@porterscott.com>; Anita Tellmann <atellmann@porterscott.com>; Jasmyn S. Scarlett <jscarlett@porterscott.com>
**Subject:** Re: Thomas v. County of Sacramento

***External email***

I will call you today. I forgot about that!

2

On Wed, Jan 29, 2020 at 3:10 PM Barakah M. Amaral <<u>bamaral@porterscott.com</u>> wrote:

Hi Stewart,


We are starting to prepare our Motion for Summary Judgment. Judge Mendez requires that we meet-and-confer before filing any Motion. I would like to discuss/clarify which claims Thomas is pursuing from his Complaint. Can you please call me on this matter? Please call my work cell — █████████

Thank you so much,




*Barakah M. Amaral*

Litigation Associate

350 University Avenue | Suite 200 | Sacramento, CA 95825
T| 916. 929. 1481 x 347  F| 916. 927. 3706

<u>www.PorterScott.com</u>

--

**CONFIDENTIALITY NOTICE:**
This email and any attachments thereto may contain private, confidential, and privileged material for the sole use of the intended recipient. Any review, copying, or distribution of this email (or any attachments thereto) by other than the Law Office of Stewart Katz or the intended recipient is strictly prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete the original and any copies of this email and any attachments thereto.

# EXHIBIT C

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

---oOo---


KENARD THOMAS,

       Plaintiff(s),

vs.                                    No. 2:18-CV-02048 JAM-DB

COUNTY OF SACRAMENTO; SCOTT
JONES; and NICHOLAS RUSSELL,

       Defendant(s).

_____/


Deposition of

KENARD L. THOMAS

Wednesday, May 8, 2019


Reported by:
SUSAN I. STUART, CSR No. 6410
Registered Professional Reporter
Job No. 3333RP8

```
 1                         APPEARANCES

 2

 3   For the Plaintiff:

 4         LAW OFFICE OF STEWART KATZ

 5         By:  STEWART KATZ, ESQ.

 6         555 University Avenue, Suite 270

 7         Sacramento, California 95825

 8         916.444.5678

 9         StewartKatzLaw@gmail.com

10

11   For the Defendant:

12         PORTER SCOTT

13         By:  BARAKAH M. AMARAL, ESQ.

14         350 University Avenue, Suite 200

15         Sacramento, California 95825

16         916.929.1481

17         BAmaral@PorterScott.com

18

19

20

21

22

23

24

25
```

1                  UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF CALIFORNIA

3                            ---o0o---

4

5     KENARD THOMAS,

6               Plaintiff(s),

7     vs.                          No. 2:18-CV-02048 JAM-DB

8     COUNTY OF SACRAMENTO; SCOTT
      JONES; and NICHOLAS RUSSELL,
9
                Defendant(s).
10    _____/

11

12

13         BE IT REMEMBERED that on Wednesday, May 8,

14    2019, commencing at the hour of 9:35 a.m. at SACRAMENTO

15    COUNTY MAIN JAIL, 651 I Street, Sacramento, California

16    95814, before me, SUSAN I. STUART, a Certified Shorthand

17    Reporter in and for the State of California, there

18    personally appeared

19

20                  KENARD L. THOMAS

21

22    called as a witness herein, and after having been first

23    duly sworn to tell the truth, the whole truth, and

24    nothing but the truth, was examined and testified as

25    follows.

                                                              5

```
 1   Miss Drayton?

 2   A.       Yeah.

 3   Q.       And how did you touch Miss Drayton?

 4           MR. KATZ:  Again I'm going to object.  I really

 5   don't understand the point of this.  We know the

 6   officers had some knowledge of his criminal record.

 7   What they had no knowledge of doesn't matter.  He has

 8   criminal misdemeanor convictions for some of that

 9   conduct.  He has a felony conviction now, as you know.

10   So I don't really see how this possibly leads to

11   anything other than harassing him and getting him

12   frustrated and potentially exposing him to enhancements

13   for other conduct.  He's in custody now, and I

14   believe --

15           Your case hasn't been adjudicated yet; correct?

16           THE WITNESS:  Right.

17           MR. KATZ:  So I'm going to have to -- given it

18   could have an impact on his sentencing, I'm going to

19   recommend him not to answer these questions on these

20   prior dates.

21   Q.       BY MS. AMARAL:  You still have pending charges

22   regarding assaults that you've been charged with toward

23   Ericka Drayton?

24   A.       Yeah.

25   Q.       So you are still awaiting trial on those
```

                                                                    25

Kenard L. Thomas                          05/08/2019

 1   Q.        And is it okay from here on out if I use the

 2   term "incident" that it's understood that means the

 3   shooting that is the subject to your complaint?

 4   A.        Yes.

 5   Q.        Okay.  So from here on out that's what we'll

 6   use for "incident."

 7             So the -- you guys at some point were squatting

 8   in a vacant home on 53rd Street?

 9   A.        Yes.

10   Q.        That's where you were contacted by deputies

11   during this incident?

12   A.        Right.

13   Q.        Okay.  And is it fair from here on out if I use

14   the term "vacant home" that I'm referring to the home on

15   53rd Street?

16   A.        Yeah.

17   Q.        It's the home that this incident occurred in?

18   A.        Yes, ma'am.

19   Q.        Okay.  How long were you guys living in that

20   vacant home?

21   A.        The whole time.  Like from February to July --

22   June, I guess.  Until I got shot.  From like February to

23   June.  Well, she left in May.  And then I stayed there

24   the previous time by myself while she was like at her

25   mom's house.

                                                          30

Kenard L. Thomas                                   05/08/2019

1  Q.        And you're talking about February 2017?

2  A.        Yeah.

3  Q.        To June of 2017?

4  A.        Yeah.

5  Q.        And just so we're clear, your testimony is

6  that --

7  A.        Yes.

8  Q.        -- Miss Drayton moved out May of 2017?

9  A.        Yeah.

10  Q.        But your relationship you previously testified

11  to ended in April 2017?

12  A.        Well, because I got out -- I got out May 1st.

13  I got out of jail May 1st, and then our relationship was

14  like rocky.  So I didn't know she was already like

15  dating someone else in April, but then when I got out I

16  kind of like confronted her about it.  That's when she

17  kind of denied it, but I found out -- eventually once

18  everything all happened like May 2nd like I found out

19  she was messing with someone else.  Like her and this

20  guy was dating in April.  I was like "How is that

21  possible?"  I was in jail.  We were just together.  So

22  she was like doing a lot of undercover --

23  Q.        Were you upset by that, to hear that news?

24  A.        Kind of betrayed about it, kind of hurt

25  emotionally, yeah.

                                                        31

```
 1   estimate on the number of people that lived in that
 2   vacant home with you?
 3   A.       At least four people.
 4   Q.       Can you provide their names?
 5   A.       Joe.  Ericka.  Someone else named Ericka.
 6   There was two people.  Kelly, Jen, and Red.
 7   Q.       Are you still in contact with those people?
 8   A.       No.
 9   Q.       Now, it's fair to say that you didn't own the
10   home, the vacant home on 53rd Street; correct?
11   A.       Right.
12   Q.       And did you know who owned that home?
13   A.       No, not really.  Just someone like -- I forgot.
14   Like some random person that I knew like through the
15   streets.  Like "Hey, you don't have a place to stay?  I
16   have some keys to this place you can stay at.  It's
17   pretty clean, you know."
18           I'm like "All right, I'll give it a try.  Am I
19   going to get in trouble for going in there?"  I didn't
20   want to have a burglary on my record going into someone
21   else's dwelling.
22           "No.  It's cool.  It's totally cool."
23           "All right."
24   Q.       So someone gave you keys to this vacant home?
25   A.       Yeah.
```

1   Q.      And what doors did those keys work for to that

2   vacant home?

3   A.      Both of the side gates.  Like there was a

4   security gate for the porch.  Two security gates in the

5   front yard, the front door, the security gate in the

6   back, and then the back door.

7   Q.      And the key worked to all of those?

8   A.      Yeah.

9   Q.      And did you use the key to unlock the security

10  gates?

11  A.      Yeah.  That's how I was getting in the house.

12  Q.      Including the front porch security gate?

13  A.      Yeah.  Because I -- I'm the one that put like a

14  bike chain around the gate because one of the top

15  keys -- the locks were broken.  So I guess someone tried

16  to break the locks before.  So they still worked, but it

17  was exposed.  So all you could do is stick your hand in

18  there and open it like with a pencil or pen or

19  something, so I put a lock around it with another lock.

20  That was -- so someone can't just break in the house

21  while we were gone.

22  Q.      Now, who was the person that gave you keys to

23  the vacant home?

24  A.      A guy named Robert.

25  Q.      Who was it?

35

Kenard L. Thomas                                    05/08/2019

```
 1   A.        Robert.

 2   Q.        What's his last name?

 3   A.        I don't know his last name.

 4   Q.        Okay.  And did Robert tell you that he owned

 5   the vacant home?

 6   A.        No.

 7   Q.        Were you paying Robert any type of rent for the

 8   vacant home?

 9   A.        No.

10   Q.        So you knew you weren't technically supposed to

11   be in that vacant home; correct?

12   A.        Yeah.  I kind of like felt that I wasn't

13   supposed to be in there.  But because of my situation I

14   was like, you know, I needed a place to stay and like I

15   didn't want to be out on the street.

16   Q.        And it's fair to say that there wasn't any

17   furniture in that vacant home; right?

18   A.        No.

19   Q.        It was completely cleared out?

20   A.        Yeah.

21   Q.        And you knew no one else was living there;

22   correct?

23   A.        Right.

24   Q.        But you weren't supposed to live there?

25   A.        Well, I guess, no, I wasn't supposed to be
```

36

1  there.

2  Q.      Now, when you and Ericka Drayton were not

3  physically together, did you know how to get in contact

4  with her?

5  A.      Call her phone.  But her phone was there with

6  me, so --

7  Q.      Did you have her phone number -- or did you

8  know her phone number when you guys were in a dating

9  relationship?

10 A.      Yeah.

11 Q.      Do you know her phone number today, the

12 telephone number?

13 A.      Hell, no.  I don't even know if she's got a

14 phone.

15 Q.      Did she have the same phone number the entire

16 time that you guys were dating?

17 A.      She had like two different numbers maybe.  I

18 had a phone, she had a phone.  Most of the time we

19 didn't really need the phone to call each other because

20 we were always together.  Like "Oh, let me use your

21 phone so I can call my mom."  I'd give her my phone.  Or

22 she would end up getting a cell phone and then I would

23 have her phone number.

24         Like I said, we never really needed to call

25 each other unless I was -- "I'll be back," and I'd walk

37

 1  to the store.  She'll call me and tell me to get

 2  something or whatever.  That's the only time like we'd

 3  need the phone.  We were always together, so there was

 4  no need.

 5  Q.     Now, you said that Miss Drayton moved out of

 6  the vacant home in May of 2017; correct?

 7  A.     Yes.

 8  Q.     Do you know where she moved to?

 9  A.     Back to her mom's house.

10  Q.     Do you know where her mom lived?

11  A.     Doreen.  Doreen Way.  Doreen.

12  Q.     Had you been to Erika Drayton's mother's home

13  before?

14  A.     Yeah.  That's where my ID was getting sent to.

15  Her mom helped me get like my identification and stuff.

16  Like her mom was helpful, and then things just turned

17  out really bad.

18  Q.     And you had spent time with Ericka Drayton's

19  mom --

20  A.     Yeah.

21  Q.     -- while you guys were dating?

22  A.     Right.

23  Q.     And how far away was the -- was Ericka

24  Drayton's mother's home from the vacant home where you

25  and Ericka Drayton had been living?

                                                        38

1    A.        Give or take, maybe like 5,000 yards.  Like it

2    was pretty far.  Not that far.  Probably like maybe a

3    mile.

4    Q.        A mile?

5    A.        Yeah.  Probably a mile and a half.

6    Q.        Could you guys walk to that location?

7    A.        Yeah.

8    Q.        If you walked, how long would it take you?

9    A.        I don't know, depended how fast we walked or

10   how cold it was or if it was raining.  I don't know,

11   like ten minutes, 15 minutes.

12   Q.        And would you guys walk between Ericka

13   Drayton's mother's home and that vacant home very often?

14   A.        Yeah.  Because she'll want to go to her mom's

15   house to go get clothes or something, so we'd walk over

16   there and get clothes -- and she'll get clothes and hang

17   out with her mom for a little bit.

18   Q.        Did you own a vehicle on the date of the

19   incident?

20   A.        No.

21   Q.        Did you own a vehicle at any point while you

22   were dating Ericka Drayton?

23   A.        Yeah.

24   Q.        Did you at some point get rid of that vehicle?

25   A.        Someone stole it.

                                                           39

1  with Miss Drayton in 2015?

2  A.      I think so.

3  Q.      How long were you put on probation for?

4  A.      I think like three years.

5  Q.      Are you still currently on probation for that

6  conviction?

7  A.      Yeah.

8  Q.      When does your probation expire?

9  A.      2022 or 2023.

10 Q.      Are you currently on probation for any other

11 convictions?

12 A.      No.  Just that I guess.  Or from being shot by

13 the police.

14         MR. KATZ:  If you don't know, just say you

15 don't know, Kenard.

16         THE WITNESS:  I can't recall.  I know I'm on

17 probation.

18         MR. KATZ:  I don't know if he knows whether any

19 of the probations were terminated.  Sometimes they'll

20 just roll it into one probation order.

21 Q.      BY MS. AMARAL:  Now, on the date of the

22 incident, to your knowledge were you on probation for

23 any convictions?

24 A.      Yes, I was on probation.  Misdemeanor

25 probation.  That's why I had a warrant because I didn't

                                                    45

Kenard L. Thomas                    05/08/2019

 1 | check in.

 2 | Q.      And what conviction were you on probation for

 3 | on the date of the incident?

 4 | A.      What do you mean?

 5 | Q.      What was the crime that you were on probation

 6 | for on the date of the incident?

 7 | A.      I was on probation for domestic violence.

 8 | Q.      So it's the same 2015 --

 9 | A.      Yeah.

10 | Q.      -- conviction we previously talked about?

11 | A.      Right.

12 | Q.      Now, have you been arrested for domestic

13 | violence-related crimes but not convicted?

14 | A.      (Witness nodding head.)

15 | Q.      How many times prior to June 13, 2017, were you

16 | arrested but not convicted?

17 | A.      I don't know.  I can't remember.

18 |         MR. KATZ:  I'm going to object.  I see

19 | absolutely no purpose of this other than to harass the

20 | witness really.  This has nothing to do with what

21 | happened that day that led to the lawsuit.

22 | Q.      BY MS. AMARAL:  Now, you're currently

23 | incarcerated at the Sacramento County Jail; correct?

24 | A.      Yes.

25 | Q.      And what are the charges that you're currently

46

1  Q.      Okay.  What time did you go to that vacant home

2  on the date of the incident?

3  A.      Probably like around 6:00 p.m.  Well, I was

4  there the night before.  So I stayed the night there,

5  and then I got up, got dressed, and I left, went to my

6  grandma's house.  And then I came back to the house.

7  Q.      Okay.  Now, what time did you -- so you slept

8  there the night before the incident.  So on June 12th?

9  A.      June 12th I was there sleeping.  And then the

10  13th I got up and left, and then I came back.

11  Q.      What time did you leave the vacant home?

12  A.      Probably like noon.

13  Q.      And you said you went to your grandmother's?

14  A.      Yep.

15  Q.      How long were you at your grandmother's for?

16  A.      Until like five o'clock, 5:30.

17  Q.      How did you get there?

18  A.      I rode a bike.

19  Q.      How far does your grandma live from that vacant

20  home?

21  A.      Probably like two miles, three miles.

22  Q.      And what time did you leave your grandmother's?

23  A.      About 5:30.

24  Q.      And did you go directly back to the vacant

25  home?

48

1   house was relatively lit?

2   A.      Yeah.

3   Q.      And you also said that --

4   A.      I had the hall light on and the bathroom light

5   on.

6   Q.      So you had those two lights on as well?

7   A.      Yes.

8   Q.      So what -- how did you learn that deputies were

9   at the vacant home?

10  A.      Because I was standing in the living room --

11  like in the living room where the picture window is by

12  the front door.

13  Q.      So you weren't in the bathroom shaving, you

14  were in the living room?

15  A.      I was like walking around the house.  Like I

16  was shaving, and then something told me to go -- because

17  I wanted to, you know, smoke another joint or whatever,

18  so I went into the living room.  As I'm standing in the

19  living room, I was like shaving in the living room as

20  the window is in front of me.  I'm shaving and I like

21  look over to the side and that's when I seen like the

22  police come in through the garage door.

23  Q.      Okay.  So you're walking around with your

24  electric shaver?

25  A.      Right.

72

1  Q.      And at any point did you have like any music on

2  in the home prior to the deputies coming into the vacant

3  house?

4  A.      I don't remember.

5  Q.      Was there any other noise that you recall in

6  the home other than possibly the buzzer from your

7  shaver?

8  A.      Probably had some music on, I can't remember.

9  I probably had my phone playing some music.

10 Q.      At any point prior to seeing the deputies while

11 you were in the living room, did you hear any knocking

12 on a door?

13 A.      No.

14 Q.      Did you hear anyone announce "Sheriff's

15 Department"?

16 A.      No.  Not until after they kicked in the door.

17 Q.      So where specifically were you standing in the

18 living room when you first saw and heard the deputies

19 kick through the interior garage door?

20 A.      Like right in front of like -- right in front

21 of the window, kind of like to the left of the door.

22 The door is like right in front of me.  Like I was

23 standing like to the left, like right in front of the

24 window.  I look over and then -- to the exterior doors

25 down the hall to the kitchen.  That's when I seen like a

                                                         73

Kenard L. Thomas                                    05/08/2019

1    boot come kicking through the door.  I'm like, "Oh,

2    shit."

3    Q.        Now, from where you're standing in the living

4    room next to the window, do you have a clear line of

5    sight to the interior garage door?

6    A.        Yeah, I can see the door from there.

7    Q.        So you could clearly see a boot going through

8    the door and the door swinging open?

9    A.        Yep.

10   Q.        Did you have any belief on who was coming

11   through the door at that time?

12   A.        No.

13   Q.        At that point when you hear the door swing

14   open, do you hear anyone announce "Sheriff's

15   Department"?

16   A.        No.  I seen the boot come in and I kind of like

17   panicked and then just like took off down the hall.

18   Q.        And when you say panicked, what do you mean

19   that you panicked?

20   A.        Got nervous.

21   Q.        Why were you getting nervous?

22   A.        Because I don't want to go to jail.

23   Q.        Why did you think you were going to go to jail?

24   A.        Because I had a warrant.

25   Q.        Did you believe those were sheriffs coming

74

1   through the door?

2   A.      I didn't know who it was coming in.

3   Q.      You figured it was someone that could get you

4   for your warrant?

5   A.      I figured it was someone coming in.  I just

6   like got nervous.  Kind of like "Oh, shit" and head off

7   down the hallway.

8   Q.      What warrant were you thinking they were going

9   to get you for?

10  A.      For domestic violence.

11  Q.      And what basis did you believe that they could

12  get you on a domestic violence warrant?

13  A.      What do you mean?

14  Q.      Why did you think they could arrest you for

15  that warrant?

16  A.      Because I didn't check in with probation.

17  Q.      You didn't check in with probation.

18          So in your mind you believed you could get

19  arrested on a warrant when they came through the door?

20  A.      Yeah.

21  Q.      And you panicked?

22  A.      (Witness nodding head.)

23  Q.      Is that a "yes"?

24  A.      Yes.

25  Q.      And you then said you turned around and ran?

                                                          75

1   A.        Yeah.  Kind of like ran to the closet.  Or ran

2   to the back bedroom.

3   Q.        And where did you run to exactly?

4   A.        The bedroom.

5   Q.        What bedroom?

6   A.        The bedroom on the right.

7   Q.        And is this bedroom in the clear back of the

8   home?

9   A.        Yeah.

10  Q.        Did you have any personal belongings in this

11  bedroom?

12  A.        No.

13  Q.        And you previously said you ran to a closet?

14  A.        Yeah.

15  Q.        Where specifically did you run to?

16  A.        The right side, the closet on the right.

17  Q.        Okay.  Can you describe for me what the

18  closet -- what the closet looks like if you're staring

19  at it?

20  A.        Half a closet.  Like a bar in the middle for

21  like jackets and then like a bar at the top for pants or

22  whatever.  And then it's like a small portion for like

23  long coats or something on the other side of the closet.

24  Q.        Okay.  So there's two sides to this closet?

25  A.        Yeah.  There's like a fairly normal size closet

                                                          76

Kenard L. Thomas                                   05/08/2019

1    and I guess a half closet, what you call a half closet.

2    Q.        Are there sliding doors to the closet?

3    A.        Yeah.

4    Q.        How many sliding doors are there?

5    A.        I think just one.  Maybe -- I think two doors

6    maybe.

7    Q.        Two sliding doors.

8             And the sliding doors, they go across two

9    separate parts of the closet?

10   A.        Yeah.

11   Q.        So there's a center divider in the middle of

12   the closet?

13   A.        No.  Just side by side.

14   Q.        Okay.  So you could go to the right side or you

15   can go to the left side; correct?

16   A.        Yeah.

17   Q.        And you said you went into the right side?

18   A.        Well, when you open up the closet, I went into

19   the left side.  I went to the right side of the bedroom.

20   That's where it was.

21   Q.        Looking at the closet --

22   A.        Looking at the closet from my angle, the part

23   that I entered was on the left side.

24   Q.        You went on the left side.

25             Did you have to move any of the slider doors to

                                                          77

1  get into the closet?

2  A.        The doors were open.

3  Q.        When you got into the closet, did you move the

4  slider doors at all?

5  A.        No.  When I got into the closet, they were kind

6  of like hard for me to move around.

7  Q.        So to get into the closet -- there was enough

8  space for you to get into the interior of the closet?

9  A.        · To get comfortable to try to hide, no.

10 Q.        Were you trying to hide?

11 A.        Yeah.

12 Q.        Why were you trying to hide?

13 A.        Because I don't want to go to jail.

14 Q.        When you were hiding at that point, did you

15 believe there were police officers in the vacant home?

16 A.        Yeah.  I heard them say "Sheriff's Department,"

17 like "Get the dog."

18 Q.        So at some point while you were running, do you

19 hear them announce, "them" being the individuals that

20 had kicked in the door --

21 A.        No.

22 Q.        -- hear them announce "Sheriff's Department"?

23 A.        No.

24 Q.        At what point did you hear the deputies

25 announce "Sheriff's Department"?

78

1  A.        When I'm standing in the closet.

2  Q.        Okay.  Now, when you're standing in the

3  closet -- you said you went into the left-hand side.

4  Can you from where you were standing in the left-hand

5  side see to the right-hand side of that closet?

6  A.        What do you mean?  To my right-hand side of the

7  closet would be like in the closet, like the wall.

8  Q.        Okay.  But you said there's a left side and

9  right side to this closet.

10  A.        So if I'm in the closet --

11  Q.        Okay.  Which direction are you facing?

12  A.        My back was like this, towards the window.

13  Q.        Towards the window?

14  A.        Yeah.  To my right would be the wall of the

15  interior closet.  And then my left shoulder would be to

16  the outside of the closet, which would be the bedroom.

17  So my back was kind of like to the bedroom door.

18  Q.        Are you facing into the room or are you facing

19  towards the window?

20  A.        Facing towards the window.

21  Q.        So you're sideways in the closet?

22  A.        Like this.  The way I'm standing now.  I'm

23  inside the closet like this, and the window is in front

24  of me.

25  Q.        So behind you there's a wall; right?

79

1   A.        Right.

2   Q.        Behind that wall is the right side of the

3   closet; correct?

4   A.        Yeah.

5   Q.        Okay.  And are you -- are you standing or are

6   you crouching down?

7             MR. KATZ:  Just so we're clear, if you're

8   standing -- I think -- I mean if you want a picture,

9   that's fine.  But saying right, left, I think he's

10  described it.  You've obviously seen it too.  So he's in

11  the closet.  There's a side of the -- there's two sides

12  of the closet, there's a back to the closet.  You know,

13  the built-in is facing to the right, but I'm not sure if

14  you say the wall to the closet -- I just think it's a

15  little confusing.

16            MS. AMARAL:  We can clarify.  Let's get a

17  picture.

18            MR. KATZ:  Imagine that, there's photographs.

19  Q.        BY MS. AMARAL:  Mr. Thomas, I'm showing you

20  what's been previously marked as Exhibit A.

21            And here's one for you, counsel.

22            MR. KATZ:  Thank you.

23  Q.        BY MS. AMARAL:  Do you recognize Exhibit A?

24  A.        Yes.

25  Q.        How do you recognize Exhibit A?

                                                        80

Kenard L. Thomas                                    05/08/2019

```
 1   A.        That's the closet.

 2   Q.        And that's the closet where you were --

 3   previously described where you had hidden?

 4   A.        Yeah.

 5   Q.        Now, is this the closet that you were

 6   describing that has two doors that slide back and forth?

 7   A.        Right here, yes.

 8   Q.        Does that picture depict both doors?

 9   A.        No.  Just one door.

10   Q.        So to your knowledge, there's another second

11   door --

12   A.        Yeah.

13   Q.        -- behind it?

14             Make sure to let me finish.

15   A.        Sorry.

16   Q.        It's okay.

17             Now, in that -- does that picture depict a left

18   side of the closet and a right side of the closet?

19   A.        What do you mean, like a divider?

20   Q.        Is this just the left side of the closet that

21   is shown in this picture and is the right somewhere else

22   that's not depicted in this picture?

23             MR. KATZ:  Do you understand the question?

24             THE WITNESS:  No.

25   Q.        BY MS. AMARAL:  Okay.  You previously described
```

81

Kenard L. Thomas                                    05/08/2019

 1   that the closet -- there was a left side and a right

 2   side.

 3   A.          Left side.

 4   Q.          And where is the right side?

 5   A.          Right side.

 6   Q.          Okay.  On the top of the closet can I have you

 7   write a left and a right?  An "L" for "left" and an "R"

 8   for "right."  Is that showing?  Sorry, the pen may not

 9   be great.

10           Okay.  Now, you provided that you were on the

11   left side of the closet; correct?

12   A.          Yes.

13   Q.          Can you mark with an "X" on the picture where

14   you were standing at in the closet?

15           MR. KATZ:  And if it's behind where the door

16   is, just put the "X" where you were relative to the

17   closet itself.

18   Q.          BY MS. AMARAL:  So that "X" represents where

19   you were standing?

20   A.          Yes.

21   Q.          Now, at the time that you were standing in the

22   closet when you first hid, were the doors placed in the

23   same area that's depicted in Exhibit A?

24   A.          Yeah.

25   Q.          Okay.  So from where you were standing you were

                                                              82

Kenard L. Thomas                                          05/08/2019

1   completely visible?

2   A.        Yes.

3   Q.        There wasn't a door in front of you?

4   A.        No.  I didn't close the door.

5   Q.        Okay.  Now, from where you were standing on the

6   left side of the closet, could you see over into the

7   right side of the closet?

8   A.        No.  Because my back was to the closet like

9   this.

10  Q.        Okay.  Now, if you had turned around in the

11  closet and were facing the right side of the closet,

12  would you be able to see all the way to the right side

13  of the closet?

14  A.        No.

15  Q.        Why not?

16  A.        There's a wall.

17  Q.        So there's a wall between the left and right

18  side?

19  A.        Yeah.  The middle.

20  Q.        So you had previously described that there's

21  bars --

22  A.        Right here and right here.

23  Q.        And those are on the right side of the closet?

24  A.        Yes.

25  Q.        And they allow you to hold jackets and shirts?

83

Kenard L. Thomas                                    05/08/2019

```
 1   A.        Right.

 2   Q.        You were on the side of the closet --

 3   A.        For overcoats or --

 4   Q.        Longer garments?

 5   A.        Yes.

 6   Q.        Where you marked the "X" in the closet were you

 7   standing?

 8   A.        Yeah.

 9   Q.        Were you crouching at all while you were inside

10   the closet?

11   A.        No.  There wasn't enough space to crouch, so I

12   was like standing.  I was kind of like -- not like a

13   squat.  Just standing there, but like hunched over.

14   Q.        Okay.

15   A.        And it was like I can't get comfortable.  I'm

16   going to get caught standing here, I can't get

17   comfortable.

18   Q.        You said you were facing the window.  Can I

19   have you draw an arrow from the "X" on which direction

20   your eyes were looking as you were standing?  Okay.  I'm

21   sorry, that pen is not very good.

22             Now, when you're standing sideways, is your

23   back up against that middle part of the closet between

24   the left and the right?

25   A.        Yeah.
```

84

Kenard L. Thomas                                    05/08/2019

1  Q.        Is any part of your body covered or shielded by

2  the doors to this closet?

3  A.        Probably.  Maybe my shoulder maybe, yeah.

4  Well, the closet doors were still placed the way they

5  were, but when I was standing there the divider is like

6  right in the middle where this little indication is.

7  Q.        So you want to draw a line of where the middle

8  of the closet is?  Thank you.  Sorry again about the

9  pen.

10           And you just indicated that there's a line in

11  the middle of the closet.  That's a wall that you cannot

12  see through; correct?

13  A.        Right.

14  Q.        And it's fair to say you were leaning up

15  against that wall?

16  A.        Yeah.  My back was like this to the wall.

17  Q.        So where you put the "X" is that accurate on

18  where you were standing in the closet?

19  A.        Yeah.  For the most part, yeah.

20  Q.        So from that "X" your back could touch this

21  middle wall?

22  A.        Because it's not -- from this angle it might

23  seem like bigger by space, but actually it's not a big

24  space.

25  Q.        How much would you estimate is the --

85

1  A.        No.

2  Q.        Okay.  Did you see anyone holding a firearm?

3  A.        No.

4  Q.        Okay.  All you see is a boot through the door

5  and you turn around and run?

6  A.        Yep.

7  Q.        And you go and you hide in this closet;

8  correct?

9  A.        (Witness nodding head.)

10 Q.        Okay.  What do you -- do you at some point hear

11 deputies inside the home?

12 A.        At what point?  When I was running to the

13 closet and I was in the closet.

14 Q.        And in the closet that's when you heard them

15 announce "Sheriff's Department"; correct?

16 A.        Yeah.

17 Q.        Did they say anything else that you heard while

18 you were in the closet?

19 A.        "Get the dog."

20 Q.        Okay.  At what point did you hear them say,

21 "Get the dog"?

22 A.        When they thought I was in the hallway closet.

23 Q.        Where were the deputies when they announced,

24 "Get the dog"?

25 A.        In the hallway.

87

Kenard L. Thomas                                    05/08/2019

1   room, they peeked in the room, didn't see me.  It was

2   like, "Clear, clear.  Get the dog, he's up there."

3   Q.        So at no point did you -- strike that.

4             So is it your testimony based on what you heard

5   you don't believe they came into the back bedroom?

6   A.        I don't believe they ever came in the back

7   bedroom.

8   Q.        So at any point that you were hearing them say,

9   "Clear," you never physically saw them while you were in

10  the bedroom?

11  A.        Right.

12  Q.        Okay.

13  A.        I think if they saw me, they would have like

14  arrested me.

15            MR. KATZ:  Just answer the -- she's asking what

16  you saw or heard, she didn't ask what you thought.

17  Q.        BY MS. AMARAL:  At any point did you believe

18  that the deputies had firearms on them?

19  A.        Of course.

20  Q.        And why do you say, "Of course"?

21  A.        That's what they carry, it's part of their

22  uniform.

23  Q.        Did you believe that they had their firearms

24  out while they were looking for you?

25  A.        No, I didn't know that.

90

1    cleared the room that he was in.

2             MR. KATZ:  Okay.

3    Q.       BY MS. AMARAL:  Did you come out of the closet

4    after they yelled, "Clear"?

5    A.       Yes.

6    Q.       Was it immediately after they yelled, "Clear"?

7    A.       Pretty much, yeah.

8    Q.       And how did you come out of the closet?

9    A.       With my hands up.

10   Q.       Did you have to move the door to come out of

11   the closet?

12   A.       No.

13   Q.       And can you describe how you had your hands

14   when you came out of the closet?

15   A.       Like this.

16   Q.       For the record, your hands are at your ear

17   length, palms facing out.

18   A.       Well, in this hand I had a lighter.

19   Q.       And which hand are you indicating?

20   A.       My right hand.

21   Q.       Why did you have a lighter in your hand?

22   A.       Because I was smoking a joint.

23   Q.       So you hear the deputies yell, "Clear."  Was

24   that the first time that you had heard the deputies say,

25   "Clear"?

                                                           93

1   know where they're --

2   Q.      But the sounds weren't coming from the same

3   area, the two "Clears"?

4   A.      No.  It was two different people.

5   Q.      You believe it was two different voices?

6   A.      Yeah, there was two different voices.

7   Q.      And how far was the first "Clear" from the

8   second "Clear" that you heard?

9           MR. KATZ:  In time or distance?

10          MS. AMARAL:  In time.

11          THE WITNESS:  Like seconds.

12  Q.      BY MS. AMARAL:  Seconds?

13  A.      Yeah.  Two seconds maybe, one second.

14  Q.      Based on what you heard in the closet, do you

15  believe that the "Clears" were said in the bedroom where

16  you were hiding?

17  A.      Possibly.

18  Q.      Okay.  From the time you heard the last

19  person -- the last deputy yell "Clear," how long after

20  did you come out of the closet?

21  A.      Within that second.  "Clear, clear.  Get the

22  dog."  That's when I heard them say, "Get the dog."

23  That's when it's like come out, I didn't want to get

24  bit.

25  Q.      So you hear "Clear"?

95

Kenard L. Thomas                          05/08/2019

```
 1   A.        "Clear."  I heard "Clear" twice.
 2   Q.        "Clear" twice within seconds, and then
 3   immediately you hear "Get the dog"?
 4   A.        Yep.
 5   Q.        And then immediately after that you came out of
 6   the closet?
 7   A.        Yep.
 8   Q.        When you came out of the closet, did it scare
 9   you when you heard "Get the dog"?
10   A.        Yeah.
11   Q.        And it scared you because you didn't want to
12   get bit; right?
13   A.        Right.
14   Q.        Did you kind of come out of the closet fast
15   because you didn't want to get bit?
16   A.        No.
17   Q.        Did you come out calmly?
18   A.        Yeah.
19   Q.        So you came -- you put your hands up and calmly
20   walked out of the closet?
21   A.        It's kind of like put my hands up and just
22   like -- my back was turned, so I kind of like just
23   slowly moved out of the closet.
24   Q.        Did you say anything before you came out of the
25   closet?
```

96

1    A.        No.

2    Q.        Why not?

3    A.        I don't know.  I didn't know what I was

4    supposed to say.

5    Q.        When you came out of the closet what was the

6    first thing you saw?

7              MR. KATZ:  Well, did you -- assumes facts not

8    in evidence that he came out of the closet.  I mean at

9    some point he did, but at what point?

10             THE WITNESS:  I don't understand what --

11   Q.        BY MS. AMARAL:  What was the first thing you

12   saw when you put your hands up and turned --

13   A.        Maybe a flash of lightning or something.  I

14   don't remember what I seen after that.  Because it was

15   just like as soon as I turned around it was like seeing

16   someone standing in my face and a person has a gun in

17   their hand.  I'm just sitting there like dazed.

18   Q.        So you saw a flash and a person and a gun?

19   A.        (Witness nodding head.)

20   Q.        How far away was that person standing from you

21   when you first saw them?

22   A.        Probably like two, maybe three feet.

23   Q.        How far away was the gun, if you could tell,

24   when you first observed the flash of light?

25   A.        I don't know.  It was pretty close.  I don't

97

Kenard L. Thomas                                    05/08/2019

 1  know.  It was like everything happened so fast.  Like as
 2  soon as I put my hands up and I turned in the motion, as
 3  soon as I turned around, like they say, simultaneously
 4  it's like the eye contact.  And as soon as I turned
 5  around, it's like boom, instant contact.  So I don't
 6  know how close he really was or how far the distance was
 7  of him having his hand extended out with a gun in his
 8  hand or however he was producing it.
 9          As soon as I put my hands up, I scooted out of
10  the closet and turned to the -- my left side.  And as
11  soon as I turned to the left side, it's like boom.  It
12  was like as soon as I did, it was contact, direct.
13  Q.      By the time you moved out of the closet -- you
14  put your hands up while you were in the closet; is that
15  fair to say?
16  A.      Yeah.
17  Q.      And did you at any point move the closet
18  door --
19  A.      No.
20          MR. KATZ:  Let her -- let her finish the
21  question.  Try to listen.
22  Q.      BY MS. AMARAL:  So when you put your hands up,
23  you're still facing the window; correct?
24  A.      Yes.
25  Q.      And do you have to move at all to get through

                                                        98

Kenard L. Thomas                                    05/08/2019

1   Q.        Okay.  So when you say --

2   A.        My back was to the closet.  I'm facing the

3   window.  I came out and I turned to the left side.

4   Q.        Okay.

5   A.        I can turn like going this direction.

6   Q.        And when you say turn right, you were trying to

7   put your right hand going backward, but --

8   A.        My right hand was going to the motion of my

9   left.

10  Q.        So your right hand was going forward?

11  A.        Yes.  Like I was going to -- slid out of the

12  closet and turned like that.

13  Q.        And how far did you turn to face forward before

14  you saw the flashing light?

15  A.        Probably not even a half a turn.

16  Q.        And what happened when you were -- are you

17  still in the closet at this point as you're trying to

18  turn?

19  A.        No.  I was like in front of it.

20  Q.        So you had stepped outside the closet?

21  A.        Well, like -- somewhere like -- there's a ledge

22  or like a little step or whatever as I'm stepping down.

23  Q.        Okay.  I'm going to show you what's been marked

24  as Exhibit B.  Do you recognize what's in Exhibit B,

25  Mr. Thomas?

100

Kenard L. Thomas                                    05/08/2019

1   A.        Yeah.

2   Q.        What do you see depicted in Exhibit B?

3   A.        Bedroom.

4   Q.        Is this the bedroom that you were hiding in?

5   A.        Yeah.

6   Q.        Do you see the closet you were hiding in?

7   A.        Yeah.

8   Q.        Okay.  And I want you to take an "X" and --

9   with the pen indicate with an "X" where you stepped when

10  you said that you were attempting to get out of the

11  closet.

12            (Discussion off the record.)

13            (Reporter provided Sharpie pen

14            and read question back.)

15  Q.        BY MS. AMARAL:  Now, where you indicated with

16  an "X," was that the location that you stepped with both

17  feet or one foot?

18  A.        One foot.

19  Q.        Okay.  What foot?

20  A.        My left.

21  Q.        That's your left foot?

22  A.        (Witness nodding head.)

23  Q.        So where was your right foot?

24  A.        Still in the closet.

25  Q.        Can you with another "X" indicate where in the

101

Kenard L. Thomas                    05/08/2019

1  closet your right foot was?

2        And with an "X" -- or, I'm sorry, with an arrow

3  between the two "X's" can you indicate which direction

4  your head was facing as you were getting out of the

5  closet?

6        Okay.  Now --

7        MR. KATZ:  So is he getting out of the

8  closet --

9        Just so we're clear, you're facing the window

10 as you're getting out?

11       THE WITNESS:  Yeah.

12       MR. KATZ:  Okay.

13 Q.      BY MS. AMARAL:  Now, at some point you say when

14 you're attempting to get out of the closet you see a

15 flash; correct?

16 A.      (Witness nodding head.)

17 Q.      What happens after you see the flash?

18 A.      I kind of like stand there.  Everything went

19 black, and I just stood there for a second.  I just

20 realized like this person -- like "You just shot me."

21 Q.      So did you feel yourself get shot?

22 A.      No.  But I kind of was like -- like the reality

23 kicked in, and I was like "You just fucking shot me."

24 Q.      Okay.  So you were in shock?

25 A.      I was in shock that I had been shot, but I

                                              102

 1  didn't realize that I had actually just been shot.

 2  Q.      Where were you shot at?

 3  A.      In my shoulder.

 4  Q.      Where exactly on your shoulder?

 5  A.      Right here.

 6          MS. AMARAL:  Okay.  And for the record,

 7  Mr. Thomas is indicating his right shoulder.

 8          THE WITNESS:  Yeah.

 9  Q.      BY MS. AMARAL:  Okay.  And it appears to be --

10  A.      It came out this part right here.

11  Q.      It appears to be right above the armpit?

12  A.      Yeah.

13  Q.      In the crease?

14  A.      Yeah.

15  Q.      And you're indicating that's where you were

16  shot in the front?

17  A.      Yeah.

18  Q.      And then you turned your arm over --

19  A.      I said -- no.  As I'm standing with my hands up

20  and I turn around, boom, the slug hit my shoulder and

21  ripped in my back arm.

22          MS. AMARAL:  And he's indicating on the back

23  side of his right arm.

24          THE WITNESS:  Yeah.

25  Q.      BY MS. AMARAL:  On the triceps, middle of the

                                                        103

1   being mauled by a dog.  So I didn't want to be no lunch

2   meat for no dog, so like I'm going to come out with my

3   hands up.  I'm not going to be like -- like don't be

4   threatening, don't be resisting, come out calmly with my

5   hands up because I didn't want to get bit.  So I knew,

6   you know, put your hands up, be cool, just like

7   nonchalantly come out casually, don't be, you know,

8   aggressive or whatever.

9           So I did that, put my hands up.  And I'm like

10  I've got to go out.  So I kind of like went kind of like

11  really slow because I was scared.  As I put my step down

12  and turned to my left, it's like boom.  That's when it

13  hit me.  The flash hit me, and I'm standing there

14  looking at him like "You just fucking shot me."

15  Q.        Now, when you -- you just indicated your

16  actions while you were speaking and you indicated that

17  you slowly turned to get out of the closet.  At any

18  point while you were slowly turning, did your shoulder,

19  your left shoulder that you were slowly turning, did it

20  ever protrude out of the closet?

21  A.        Of course.  As I was stepping out.

22  Q.        And then your right shoulder never made it out

23  of the closet because you said you only did half of a

24  turn; correct?

25  A.        Yeah, I did almost like a half a turn.  As I'm

                                                        106

1  turning half, like boom, that's when I was hit in the

2  shoulder.

3  Q.       Okay.  And to your knowledge, at any point

4  while you were attempting to get out of the closet, did

5  you feel yourself move any of the closet doors?

6  A.       No.  Maybe after he shot me, maybe.  I don't

7  know.  But once he -- as I was getting out, the closet

8  doors never moved.  I never did touch them to open or

9  close or whatever.

10  Q.       And prior to attempting to get out of the

11  closet, at any point did you see the closet doors move?

12  A.       No.

13           MS. AMARAL:  Mind if we take a quick break and

14  I'll finish up after the break?

15           MR. KATZ:  Sure.

16               (Break taken 11:40 to 11:55.)

17  Q.       BY MS. AMARAL:  Mr. Kenard -- Mr. Thomas, it's

18  your testimony today that you did not see the deputies,

19  visually see them, at any point prior to getting shot in

20  the vacant home on the date of the incident; correct?

21  A.       Right.

22  Q.       Now, when the deputies yelled, "Clear, clear,"

23  at that time you believed the deputies were looking for

24  you in the house; correct?

25  A.       Looking for someone.

                                                        107

Kenard L. Thomas                                    05/08/2019

1   Q.        Did you believe that someone was you?

2   A.        My guess.  I mean they were looking for someone

3   in the house, I guess.  I didn't know they were looking

4   specifically for me.

5   Q.        But you were hiding just in case they were

6   looking for you?

7   A.        Yeah.

8   Q.        At any point while you were hiding in the

9   closet, and you testified for seconds, did you see --

10  did you hear any of the deputies have a conversation

11  with each other in the house?

12  A.        No.

13  Q.        Okay.  Based on the --

14            MR. KATZ:  Apart from what he commented about

15  the dog, other than what was already testified to.

16  Q.        BY MS. AMARAL:  Other than what you already

17  testified to.

18  A.        (Witness nodding head.)

19  Q.        Based on hearing two separate voices yell,

20  "Clear" and then a couple of seconds later yell,

21  "Clear," it's your understanding there was more than one

22  deputy inside the vacant home; right?

23  A.        Yes.

24  Q.        Okay.  I do want to show you what's been

25  previously marked as Exhibit C.  Do you recognize any of

                                                        108

Kenard L. Thomas                                    05/08/2019

1                    REPORTER'S CERTIFICATE

2

3        I, SUSAN I. STUART, a duly licensed Certified

4   Shorthand Reporter of the State of California, hereby

5   certify that the witness in the foregoing deposition was

6   by me duly sworn;

7        That said testimony was taken down in

8   stenographic shorthand by me, a disinterested person, at

9   the time and place therein stated and was thereafter

10  reduced to typewriting and that the testimony as

11  transcribed is a true record of the testimony given by

12  the witness;

13       That before completion of the deposition, review

14  of the transcript [X] was [ ] was not requested.  If

15  requested, any changes made by the deponent (and

16  provided to the reporter) during the period allowed are

17  appended hereto.

18       I further certify that I am not of counsel or

19  attorney for either or any of the parties to the said

20  deposition, nor in any way interested in the outcome of

21  this cause.

22       Dated this 13th day of May, 2019.

23

24       _____
         SUSAN I. STUART, CSR 6410

25

                                                         137

Royal Phillips Court Reporters
(888) 333-8270

SF - Sacramento - Stockton                    rpcourtreporters.com

# EXHIBIT D



EXHIBIT B
WIT: Thomas
DATE: 5-8-19
S. STUART, CSR 6410

# EXHIBIT E

1

**PORTER | SCOTT**

2   A PROFESSIONAL CORPORATION
Carl L. Fessenden, SBN 161494

3   Barakah M. Amaral, SBN 298726
350 University Ave., Suite 200

4   Sacramento, California 95825
TEL: 916.929.1481

5   FAX: 916.927.3706

6   Attorneys for Defendants
COUNTY OF SACRAMENTO, SCOTT JONES, and NICHOLAS RUSSELL

7

8                    UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

9

10   KENARD THOMAS,                          CASE NO. 2:18-CV-02048 JAM-DB

11              Plaintiff,                   **DEFENDANT    COUNTY    OF**

12                                           **SACRAMENTO'S REQUEST FOR**
**ADMISSIONS    TO    PLAINTIFF,**

13   v.                                      **SET ONE**

14   COUNTY OF SACRAMENTO; SCOTT
JONES; and NICHOLAS RUSSELL,           Complaint Filed: 07/26/2018

15
Defendants.

16   _____/

17   PROPOUNDING PARTY:   Defendant, COUNTY OF SACRAMENTO

18   RESPONDING PARTY:    Plaintiff, KENARD THOMAS

19   SET NUMBER:          One

20        Defendant COUNTY OF SACRAMENTO (hereinafter "COUNTY") requests that

21   Plaintiff KENARD THOMAS answer, under oath and in writing Pursuant to Federal Rules of

22   Civil Procedure, Rule 36, the following Request for Admissions, Set One, within thirty (30) days

23   from service of these Request for Admissions, Set One.

24                              **DEFINITIONS**

25   A.   **"YOU"** and **"YOUR"** includes Plaintiff KENARD THOMAS and anyone acting on his

26        behalf.

27   B.   **"COMPLAINT"** refers to the Complaint filed by Plaintiff on 07/26/2018 in United States

28        District Court, Eastern District of California, Case No. 22:18-CV-02048 JAM-DB.

{01892292 DOCX}                          1

**DEFENDANT COUNTY OF SACRAMENTO'S REQUEST FOR ADMISSIONS TO PLAINTIFF, SET ONE**

_PORTER | SCOTT_
_350 University Ave., Suite 200_
_Sacramento, CA 95825_
_TEL: 916.929.1481_
_FAX: 916.927.3706_

1  C.    **"INCIDENT"** includes the circumstances and events surrounding the alleged accident,

2         injury, or other occurrence giving rise to this action or proceeding.

3  D.    **"RESIDENCE"** means the home located at 5208 53rd Avenue, Sacramento, California.

4                              **REQUEST FOR ADMISSIONS**

5  **REQUEST FOR ADMISSION NO. 1:**

6         Admit that YOU hid in the closet after the deputies announced their presence in the

7  RESIDENCE on June 13, 2017.

8  **REQUEST FOR ADMISSION NO. 2:**

9         Admit that prior to INCIDENT alleged in YOUR COMPLAINT, YOU ran from officers to

10  avoid being arrested.

11  **REQUEST FOR ADMISSION NO. 3:**

12         Admit that prior to entering the RESIDENCE on June 13, 2017, YOU were carrying a

13  firearm on YOUR person.

14  **REQUEST FOR ADMISSION NO. 4:**

15         Admit that YOU have been previously arrested for willfully resisting, delaying or

16  obstructing a police officer in violation of California Penal Code section 148(a)(1).

17  **REQUEST FOR ADMISSION NO. 5:**

18         Admit that YOU have been previously arrested for committing acts of violence on

19  Erika Drayton.

20  **REQUEST FOR ADMISSION NO. 6:**

21         Admit that YOU have been previously convicted of committing acts of violence on

22  Erika Drayton.

23  **REQUEST FOR ADMISSION NO. 7:**

24         Admit that YOU have been previously convicted of felony criminal offenses in the last ten

25  years.

26  **REQUEST FOR ADMISSION NO. 8:**

27         Admit that YOU were not lawfully residing at the RESIDENCE where the INCIDENT

28  occurred on June 13, 2017.

PORTER | SCOTT
350 University Ave., Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

{01892292.DOCX}                              2

**DEFENDANT COUNTY OF SACRAMENTO'S REQUEST FOR ADMISSIONS TO PLAINTIFF, SET ONE**

PORTER | SCOTT
350 University Ave., Suite 200
Sacramento, CA 95825
TEL: 916.929.1481
FAX: 916.927.3706

1   **REQUEST FOR ADMISSION NO. 9:**

2   Admit that Defendant NICHOLAS RUSSELL is not liable to YOU under YOUR First

3   Claim for Relief alleged in YOUR COMPLAINT.

4   **REQUEST FOR ADMISSION NO. 10:**

5   Admit that Defendants are not liable to YOU under YOUR Second Claim for Relief

6   alleged in YOUR COMPLAINT.

7   **REQUEST FOR ADMISSION NO. 11:**

8   Admit that Defendants are not liable to YOU under YOUR Third Claim for Relief alleged

9   in YOUR COMPLAINT.

10  **REQUEST FOR ADMISSION NO. 12:**

11  Admit that Defendants are not liable to YOU under YOUR Fourth Claim for Relief alleged

12  in YOUR COMPLAINT.

13  **REQUEST FOR ADMISSION NO. 13:**

14  Admit that Defendants are not liable to YOU under YOUR Fifth Claim for Relief alleged

15  in YOUR COMPLAINT.

16  **REQUEST FOR ADMISSION NO. 14:**

17  Admit that YOU knew the deputies had reasons to arrest YOU when they attempted to

18  contact with YOU inside the RESIDENCE on June 13, 2017.

19  **REQUEST FOR ADMISSION NO. 15:**

20  Admit that YOU knew the deputies had a right to contact YOU inside the RESIDENCE

21  prior to the INCIDENT alleged in YOUR COMPLAINT.

22  **REQUEST FOR ADMISSION NO. 16:**

23  Admit SCOTT JONES is not liable to YOU for punitive damages.

24  **REQUEST FOR ADMISSION NO. 17:**

25  Admit NICHOLAS RUSSELL is not liable to YOU for punitive damages.

26  ///

27  ///

28  ///

{01892292.DOCX}                                     3

**DEFENDANT COUNTY OF SACRAMENTO'S REQUEST FOR ADMISSIONS TO PLAINTIFF, SET ONE**

1

2        10/10/2018

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PORTER SCOTT
A PROFESSIONAL CORPORATION

By _____
    Carl L. Fessenden
    Barakah M. Amaral
    Attorneys for Defendants
    COUNTY OF SACRAMENTO,
    SCOTT JONES, and NICHOLAS
    RUSSELL

PORTER | SCOTT
350 University Ave., Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

{01892292 DOCX}                          4

**DEFENDANT COUNTY OF SACRAMENTO'S REQUEST FOR ADMISSIONS TO PLAINTIFF, SET ONE**

*Thomas v. County of Sacramento, et al.*
**U.S.D.C. - Eastern District of CA**
**2:18-cv-02048-JAM-DB**

## DECLARATION OF SERVICE

I am a resident of the United States and of the County, of Sacramento, California. I am over the age of eighteen years and not a party to the within above-entitled action. My business address is 350 University Avenue, Suite 200, Sacramento, California.

I am familiar with this Company's practice whereby the mail, after being placed in a designated area, is given the appropriate postage and is deposited in a U.S. mailbox in the City of Sacramento, California, after the close of the day's business.

That on the date below, I served the following: **DEFENDANT COUNTY OF SACRAMENTO'S REQUEST FOR ADMISSIONS TO PLAINTIFF, SET ONE** on all parties in the said action as addressed below by causing a true copy thereof to be served:

| XX | **BY MAIL:** I placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business' practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. |
|---|---|
| | **BY PERSONAL SERVICE:** I caused such document to be personally delivered to the person(s) addressed below. (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office, between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and six in the evening. |
| | **BY OVERNIGHT DELIVERY:** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the person(s) listed below. I placed the envelope or package for collection and overnight delivery at my office or a regularly utilized drop box of the overnight delivery carrier. |
| | **BY ELECTRONIC SERVICE:** Based on a court order or an agreement of the parties to accept service by electronic transmission, I caused the documents to be sent to the persons at the electronic notification address listed below. |

Stewart Lee Katz
LAW OFFICE OF STEWART KATZ
555 University Avenue, Suite 270
Sacramento, CA 95825
*Attorneys for Plaintiff*

I declare under penalty of perjury that the foregoing is true and correct. Executed at Sacramento, California, on October 10, 2018.

Anita J. Tellmann

{01892292.DOCX}                    5

**DEFENDANT COUNTY OF SACRAMENTO'S REQUEST FOR ADMISSIONS TO PLAINTIFF, SET ONE**

PORTER | SCOTT
350 University Ave., Suite 200
Sacramento, CA  95825
TEL. 916.929.1481
FAX. 916.927.3706

# EXHIBIT F

1  **LAW OFFICE OF STEWART KATZ**
2  STEWART KATZ, State Bar #127425
   555 University Avenue, Suite 270
3  Sacramento, California 95825
   Telephone: (916) 444-5678
4
5  Attorney for Plaintiff
   KENARD THOMAS
6

7              **UNITED STATES DISTRICT COURT**

8             **EASTERN DISTRICT OF CALIFORNIA**

9

10  KENARD THOMAS,                    CASE NO. 2:18-CV-02048 JAM-DB

11        Plaintiff,                  **PLAINTIFF'S RESPONSE TO**
                                      **DEFENDANT COUNTY OF**
12  v.                                **SACRAMENTO'S REQUEST FOR**
                                      **ADMISSIONS, SET ONE**
13  COUNTY OF SACRAMENTO; SCOTT
14  JONES; and NICHOLAS RUSSELL,

15        Defendants.

16  _____/

17

18  PROPOUNDING PARTY:     Defendant, COUNTY OF SACRAMENTO

19  RESPONDING PARTY:      Plaintiff, KENARD THOMAS

20  SET NUMBER:            One

21          The attached Responses to Defendant County of Sacramento's Request for

22  Admissions, Set One, are served upon you pursuant to the provisions of Rule 36 of the

23  Federal Rules of Civil Procedure.

24          Plaintiff responds to Defendant's Request for Admissions as follows:

25                    **REQUEST FOR ADMISSIONS**

26  **REQUEST FOR ADMISSION NO. 1:**

27          Admit that YOU hid in the closet after the deputies announced their presence in the

28  RESIDENCE on June 13, 2017.

PLAINTIFF'S RESPONSE TO DEFENDANT COUNTY OF SACRAMENTO'S REQUEST
FOR ADMISSIONS, SET ONE
                              1

1 **RESPONSE:**

2     Plaintiff admits that he went into a closet after becoming aware that there were

3 sheriff's deputies attempting to enter the house where he was shot and that he was in less

4 open view while in the closet than he was before he entered the closet. Plaintiff denies to the

5 extent the request suggests his body was in a further position of "hiding" while in the closet.

6 **REQUEST FOR ADMISSION NO. 2:**

7     Admit that prior to INCIDENT alleged in YOUR COMPLAINT, YOU ran from

8 officers to avoid being arrested.

9 **RESPONSE:**

10     Object that "prior to INCIDENT" is vague in time. Without waiving the objection,

11 plaintiff denies that he ran from officers to avoid being arrested outside of the residence.

12 Plaintiff admits that after the time he became aware the deputies were outside of the

13 residence, he moved rapidly into the closet. Admit that the purpose of movement was to

14 avoid coming into contact with the officers, whatever purpose of the officers had.

15 **REQUEST FOR ADMISSION NO. 3:**

16     Admit that prior to entering the RESIDENCE on June 13, 2017, YOU were carrying a

17 firearm on YOUR person.

18 **RESPONSE:**

19     Deny.

20 **REQUEST FOR ADMISSION NO. 4:**

21     Admit that YOU have been previously arrested for willfully resisting, delaying or

22 obstructing a police officer in violation of California Penal Code section 148(a)(1).

23 **RESPONSE:**

24     Admit.

25 **REQUEST FOR ADMISSION NO. 5:**

26     Admit that YOU have been previously arrested for committing acts of violence on

27 Erika Drayton.

28

1   **RESPONSE:**

2       Admit.

3   **REQUEST FOR ADMISSION NO. 6:**

4       Admit that YOU have been previously convicted of committing acts of violence on

5   Erika Drayton.

6   **RESPONSE:**

7       Deny.

8   **REQUEST FOR ADMISSION NO. 7:**

9       Admit that YOU have been previously convicted of felony criminal offenses in the last

10  ten years.

11  **RESPONSE:**

12      Deny.

13  **REQUEST FOR ADMISSION NO. 8:**

14      Admit that YOU were not lawfully residing at the RESIDENCE where the INCIDENT

15  occurred on June 13, 2017.

16  **RESPONSE:**

17      Admit.

18  **REQUEST FOR ADMISSION NO. 9:**

19      Admit that Defendant NICHOLAS RUSSELL is not liable to YOU under YOUR First

20  Claim for Relief alleged in YOUR COMPLAINT.

21  **RESPONSE:**

22      Deny.

23  **REQUEST FOR ADMISSION NO. 10:**

24      Admit that Defendants are not liable to YOU under YOUR Second Claim for Relief

25  alleged in YOUR COMPLAINT.

26  **RESPONSE:**

27      Deny.

28

PLAINTIFF'S RESPONSE TO DEFENDANT COUNTY OF SACRAMENTO'S REQUEST
FOR ADMISSIONS, SET ONE

1   **REQUEST FOR ADMISSION NO. 11:**

2       Admit that Defendants are not liable to YOU under YOUR Third Claim for Relief

3   alleged in YOUR COMPLAINT.

4   **RESPONSE:**

5       Deny.

6   **REQUEST FOR ADMISSION NO. 12:**

7       Admit that Defendants are not liable to YOU under YOUR Fourth Claim for Relief

8   alleged in YOUR COMPLAINT.

9   **RESPONSE:**

10      Deny.

11  **REQUEST FOR ADMISSION NO. 13:**

12      Admit that Defendants are not liable to YOU under YOUR Fifth Claim for Relief

13  alleged in YOUR COMPLAINT.

14  **RESPONSE:**

15      Deny.

16  **REQUEST FOR ADMISSION NO. 14:**

17      Admit that YOU knew the deputies had reasons to arrest YOU when they attempted to

18  contact with YOU inside the RESIDENCE on June 13, 2017.

19  **RESPONSE:**

20      Plaintiff denies based on a lack of known information at the time as to what those

21  deputies knew or did not know. Plaintiff admits that generally he thought there might be

22  reason for him to be arrested.

23  **REQUEST FOR ADMISSION NO. 15:**

24      Admit that YOU knew the deputies had a right to contact YOU inside the

25  RESIDENCE prior to the INCIDENT alleged in YOUR COMPLAINT.

26  **RESPONSE:**

27      Admit.

28

PLAINTIFF'S RESPONSE TO DEFENDANT COUNTY OF SACRAMENTO'S REQUEST
FOR ADMISSIONS, SET ONE

1  **REQUEST FOR ADMISSION NO. 16:**

2      Admit SCOTT JONES is not liable to YOU for punitive damages.

3  **RESPONSE:**

4      Deny.

5  **REQUEST FOR ADMISSION NO. 17:**

6      Admit NICHOLAS RUSSELL is not liable to YOU for punitive damages.

7  **RESPONSE:**

8      Deny.

9                    **VERIFICATION TO FOLLOW**

10

11

12  Dated:  December 11, 2018

                         STEWART KATZ
13                       Attorney for Plaintiff

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PROOF OF SERVICE

**CASE:**       <u>Kenard Thomas. v. County of Sacramento, et al.</u>
**COURT:**   U.S. District Court, Eastern District of California
**NO:**        2:18-CV-02048-JAM-DB

     I, the undersigned, declare that I am over 18 years of age, and not a party to or interested in the within entitled cause.  I am an employee of the Law Office of Stewart Katz, and my business address is 555 University Ave, Suite 270, Sacramento, CA 95825.

     On December 11, 2018 I served the attached  **PLAINTIFFS' RESPONSE TO DEFENDANT COUNTY OF SACRAMENTO'S REQUEST FOR ADMISSIONS, SET ONE,** to the Defendants in this matter by causing a true copy to be hand-delivered to the following addressee(s):

Carl L. Fessenden,
PORTER SCOTT
350 University Ave., Suite 200
Sacramento, CA 95825

     I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on December 11, 2018, at Sacramento, California.

Victoria L. Burau

# EXHIBIT G



# EXHIBIT H

1  **P O R T E R | S C O T T**

2  A PROFESSIONAL CORPORATION
   Carl L. Fessenden, SBN 161494

3  Barakah M. Amaral, SBN 298726
   350 University Ave., Suite 200

4  Sacramento, California 95825
   TEL: 916.929.1481

5  FAX: 916.927.3706

6  Attorneys for Defendants
   COUNTY OF SACRAMENTO, SCOTT JONES, and NICHOLAS RUSSELL

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10                                      CASE NO. 2:18-CV-02048 JAM-DB

11  KENARD THOMAS,

12          Plaintiff,              **DECLARATION OF NICHOLAS
                                    RUSSELL IN SUPPORT OF
13  v.                             DEFENDANTS' MOTION AND
                                    MOTION FOR SUMMARY JUDGMENT,
14                                  OR IN THE ALTERNATIVE, PARTIAL
    COUNTY OF SACRAMENTO; SCOTT     SUMMARY JUDGMENT**
15  JONES; and NICHOLAS RUSSELL,

16          Defendants.            **DATE:    April 21, 2020
                                    TIME:    1:30 p.m.
17                                  CTRM:   6, 14th Floor
                                    JUDGE:  Hon. John A. Mendez**
18

19  _____/   Complaint Filed: 07/26/2018

20          I, Nicholas Russell, declare:

21          1.      I am a Deputy Sheriff at the Sacramento County Sheriff's Department.  I have been

22  a Deputy Sheriff for approximately seven years.

23          2.      On June 13, 2017 at approximately 7:20 p.m., Deputy Rowe and I responded to a

24  call for service for a restraining order violation at 6636 Doreen Way, Sacramento, California, and

25  made contact with Erika Drayton.  Deputy Rowe and I were in full police uniform and each

26  responded in a marked patrol vehicle.

27          3.      We contacted Erika Drayton, who informed us that she saw her ex-boyfriend,

28  Kenard Thomas (hereinafter "Plaintiff"), walk past her mother's house at 6636 Doreen Way and

PORTER |SCOTT
350 University Ave., Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

{02158098.DOCX}                        1

she believed he had a firearm in his waistband. Ms. Drayton said she saw Plaintiff as she drove up toward her mother's house. She said that she followed Plaintiff in a vehicle and watched him go into 5208 53rd Ave., Sacramento, California (hereinafter "vacant home"). Ms. Drayton reported that Plaintiff was known to go into that vacant home.

4.     That vacant home was approximately .40 miles from Ms. Drayton's mother's house. I am familiar with the vacant home, and knew it to be vacant, because I had responded there a month earlier to investigate a transient who was reported as a trespasser.

5.     Ms. Drayton and her mother proceeded to tell Deputy Rowe and me that they were in fear for their safety after seeing Plaintiff walk by the house. Ms. Drayton advised that she dated Plaintiff until May of 2017. She broke up with Plaintiff after she had been physically assaulted by Plaintiff in March and May of 2017. Plaintiff broke Ms. Drayton's nose in one of the domestic violence incidents. Ms. Drayton advised that Plaintiff was arrested after both the domestic violence assaults in March and May of 2017. She advised that Plaintiff carried knives, had a history of running and hiding from police officers, and she believed that he was a violent person. Ms. Drayton and her mother, Carrie Rabourn, also advised us that Plaintiff had been recently sending threatening text messages to both of them through Ms. Rabourn's phone.

6.     Ms. Drayton advised us that she had requested a Domestic Violence Restraining Order on May 8, 2017, and it was granted. Deputy Rowe and I subsequently looked up that restraining order in our computer system and learned that it had not been served on Plaintiff.

7.     Deputy Rowe and I also looked up Plaintiff's criminal history. There, I discovered that he had sustained multiple arrests, as well as convictions, for domestic violence and resisting arrest/obstructing a police officer. Plaintiff was also on searchable probation.

8.     Given Plaintiff's violent history toward Ms. Drayton, the reported threatening text messages from Plaintiff to Ms. Drayton and her mother, and Plaintiff potentially being armed and in close proximity to Ms. Drayton's mother's home, we decided to make contact with Plaintiff at the vacant home to serve Ms. Drayton's restraining order.

9.     I requested assistance from Deputy Frizzie and Deputy Trummel, who were subsequently dispatched to help enter the home and make contact with Plaintiff inside the vacant

PORTER | SCOTT
350 University Ave., Suite 200
Sacramento, CA 95825
TEL: 916.929.1481
FAX: 916.927.3706

{02158098.DOCX}

2

DECLARATION OF NICHOLAS RUSSELL IN SUPPORT OF DEFENDANTS' MOTION AND MOTION FOR
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

1  home.  Deputy Frizzie and Deputy Trummel responded to the vacant home in full police uniform
2  and in marked patrol vehicles.

3      10.      Deputy Frizzie and Deputy Trummel met me and Deputy Rowe in front of the
4  vacant home, where we devised a plan which involved all four of us entering the home. The
5  vacant home has a garage door that had been lifted up on one corner.  It was apparent that it was
6  being used to enter the home. A true and correct photo of the lifted garage door is attached to the
7  Appendix of Exhibits as <u>Exhibit G</u>. Deputy Frizzie crawled under the lifted garage door and
8  subsequently let Deputy Trummel, Deputy Rowe, and me through the side garage door.

9      11.      Once inside the garage, we discussed entering the home and conducting a search.
10  All four of us then lined up alongside the wall near the door leading into the interior of the home.
11  While lined up, we made several announcements, including: "Sheriff's Department, make yourself
12  known."

13      12.      After hearing no response from within, the lead deputy opened the door leading
14  from the garage into the interior of the vacant home while continuing to make announcements.
15  Upon opening the interior door, the lead deputy observed a male subject flee from the living room
16  to the back area of the vacant home.

17      13.      Subsequently, all four of us entered the vacant home and began to search each
18  room. During the search, I had my gun drawn and was utilizing a flashlight on the end of the
19  firearm.   I continued to make announcements during the search identifying myself as the
20  "Sheriff's Department" and asking anyone to make themselves known.  After checking each room
21  and not locating any individual in the room, I would yell "clear."

22      14.      After we searched every room in the vacant home, we were unable to locate the
23  fleeing subject.  We did not believe that the fleeing subject could have left the vacant house since
24  all the windows had bars on the outside and there were no exit doors in the back of the vacant
25  home.  The deputies and I met and agreed to conduct another search of the vacant home.

26      15.      Subsequently Deputy Trummel and I started the second search in the back bedroom
27  of the vacant home. The back bedroom did not have any artificial source of light. The lighting was
28  generally poor during the search and I used my flashlight.

PORTER | SCOTT
350 University Ave., Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

{02158098.DOCX}                          3

DECLARATION OF NICHOLAS RUSSELL IN SUPPORT OF DEFENDANTS' MOTION AND MOTION FOR
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

16.     There was a closet in the back bedroom. The closet appeared to have sliding doors. My intention in searching the back bedroom including looking and clearing the back closet. As I approached the closet and began sliding open the closet door, Plaintiff suddenly stepped outside the closet. Plaintiff gave no verbal announcements of his concealed whereabouts prior to stepping out of the closet. As he exited the closet, his movement indicated he was directly coming toward me or my firearm. He was approximately 2-3 feet away from me. He was in close enough proximity that he could have shot me or tried to control my firearm.

17.     The following circumstances, known to me when Plaintiff emerged from the closet, made me fear for my life: (1)  Plaintiff was reported to have a history of running from police; (2) we observed a person in the house intentionally run and hid from us; (3) Plaintiff gave no verbal announcements and did not verbally respond to our commands, such as "make yourself known!"; (4) Plaintiff concealed his whereabouts prior to exiting the closet; (5) Plaintiff was potentially armed with a firearm; (6) Plaintiff was reported to be violent and known to carry knives; (7) Plaintiff previously sustained arrests and convictions for violent crimes and was on probation at the time of the incident; (8) Plaintiff was known to have convictions for resisting arrest/obstructing police; and (9) Plaintiff abruptly exited the closet in a manner and proximity that allowed him to easily shoot me or grab my firearm. In fear for my life, I shot Plaintiff one time. That shot hit Plaintiff in his right shoulder. Plaintiff fell immediately backwards after the shot.

I make this Declaration on my own personal knowledge except to the facts stated on information and belief. As to such facts, I believe them to be true. If called upon to do so, I could and would competently testify about the matters asserted herein.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on March _12th_, 2020, in Sacramento, California.

_Russell #1258_
Deputy Nicholas Russell

PORTER | SCOTT
350 University Ave. Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

DECLARATION OF NICHOLAS RUSSELL IN SUPPORT OF DEFENDANTS' MOTION AND MOTION FOR
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

# EXHIBIT I

**P O R T E R | S C O T T**

A PROFESSIONAL CORPORATION
Carl L. Fessenden, SBN 161494
Barakah M. Amaral, SBN 298726
350 University Ave., Suite 200
Sacramento, California 95825
TEL: 916.929.1481
FAX: 916.927.3706

Attorneys for Defendants
COUNTY OF SACRAMENTO, SCOTT JONES, and NICHOLAS RUSSELL

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

KENARD THOMAS,

         Plaintiff,

v.

COUNTY OF SACRAMENTO; SCOTT
JONES; and NICHOLAS RUSSELL,

         Defendants.

_____/

CASE NO. 2:18-CV-02048 JAM-DB

**DECLARATION OF CARL L.
FESSENDEN IN SUPPORT OF
DEFENDANTS' MOTION AND
MOTION FOR SUMMARY JUDGMENT,
OR IN THE ALTERNATIVE,
SUMMARY ADJUDICATION**

**DATE:**   **April 21, 2020**
**TIME:**   **1:30 p.m.**
**CTRM:**  **6, 14th Floor**
**JUDGE:** **Hon. John A. Mendez**

Complaint Filed: 07/26/2018

I, Carl L. Fessenden, declare:

1.    I am an attorney licensed to practice before all courts in the State of California and am a partner with the law firm of Porter Scott, attorneys of record for Defendants COUNTY OF SACRAMENTO, SCOTT JONES, and NICHOLAS RUSSELL ("Defendants").

2.    Plaintiff filed the instant action on July 26, 2018. A true and correct copy of Plaintiff's Complaint is attached to the Appendix of Exhibits as Exhibit A.

3.    Prior to filing the instant Motion, the parties met-and-conferred as required under this Court's Standing Order. After meet-and-conferring, Plaintiff's counsel advised that he was only proceeding on the following claims from Plaintiff's operative Complaint: (1) First Claim:

PORTER |SCOTT
350 University Ave., Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

1983 claim against Deputy Russel, based exclusively on excessive force in violation of the Fourth Amendment; (2) Second Claim: violation of the Bane Act only against Deputy Russell; (3) Fourth Claim: Battery; (4) Fifth Claim: Negligence.  A true and correct copy of an email from Plaintiff's counsel in this issue is attached to the Appendix of Exhibits as <u>Exhibit B</u>.

4.      Plaintiff was deposed in the instant action. True and correct copies of the relevant excerpts, with referenced exhibits, from that deposition transcript are attached to the Appendix of Exhibits as <u>Exhibit C</u>.

5.      Plaintiff testified at his deposition that he placed one foot outside of the closet before he saw Deputy Russell standing two to three feet away from him.  Plaintiff indicated the location of his foot by drawing an "X" on the floor in front of the closet in "Exhibit B" to his deposition.  A true and correct copy of Plaintiff's deposition "Exhibit B" is attached to the Appendix of Exhibits as <u>Exhibit D</u>.

6.      Defendant served Plaintiff with Request for Admissions.  A true and correct copy of Defendant's Request for Admissions Served on Plaintiff are attached to the Appendix of Exhibits as <u>Exhibit E</u>.

7.      On December 11, 2018, Plaintiff provided responses to Defendant's Requests for Admissions.  A true and correct copy of Plaintiff's amended responses to Defendant's Requests for Admissions are attached to the Appendix of Exhibits as <u>Exhibit F</u>.

I make this Declaration on my own personal knowledge except to the facts stated on information and belief.  As to such facts, I believe them to be true.  If called upon to do so, I could and would competently testify about the matters asserted herein.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on March 12, 2020, in Sacramento, California.

_/s/ Carl L. Fessenden_
Carl L. Fessenden
Attorney for Defendants
SACRAMENTO COUNTY SHERIFF'S
OFFICE and SGT. ALEXANDER

PORTER | SCOTT
350 University Ave., Suite 200
Sacramento, CA  95825
TEL: 916.929.1481
FAX: 916.927.3706

DECLARATION OF CARL L. FESSENDEN IN SUPPORT OF DEFENDANTS' MOTION AND MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION